**660** SUPREME COURT.

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Statement of Case.

UNION BANK OF FLORIDA *vs.* S. PARKHILL'S ADMINISTRATORS *de bonis non.*

S. PARKHILL'S ADMINISTRATORS *de bonis non vs.* UNION BANK OF FLORIDA.

The Bonds made by the late Territory, payable to the Union Bank of Florida, are, under the charter of that institution, the property of the Bank, and the funds arising from the sale of them, the funds of the Bank.

Shares in the Union Bank, are the mortgage securities given for stock, and a pledge of shares is a pledge of those mortgage securities.

The mortgage given by the stockholder to the Bank was executed for the purpose, 1st. as provided by the 8th sec. of the charter, of securing payment by the Bank, of the principal and interest of the bonds. 2d. Of securing payment by the stockholder to the Bank, of his stock note or obligation and interest, if he fails to renew the note and pay interest as provided in the 29th section.

When a stockholder of the Union Bank fails to renew his note, and pay up the interest, if the Bank shall file for cancellation with any officer of the government whose duty it may be to receive them for cancellation, or with the Clerk of the Court in which the suit is pending, as many Territorial Bonds as were issued on the faith and value of the mortgage securities of such defaulting stockholder, the Bank, upon judgment rendered and execution issued, may of right levy upon and sell the mortgaged premises of such defaulting stockholder, to be applied to the extinguishment of the judgment rendered on his stock note debt together with interest due and costs accrued.

A stockholder has a right to a continuance of the credit or loan which the charter gives him *only* upon his renewing his note and paying up the interest annually—and the taking of interest in advance is not a violation of the charter.

Under the plea of *plene administravit*, an administrator cannot be allowed to offer in evidence a receipt for the payment of money by him which payment has been rejected and disallowed by the probate court. Before any right attaches to offer any evidence of expenditures made by the administrator under this plea, such expenditures must have been allowed by the court of probate. The action of that court in regard to accounts of executors, &c., is conclusive, unless appealed from.

On the 31st March, 1846, the Union Bank of Florida instituted suit in Leon Circuit Court against Martha Ann Manly, administratrix, (and Hiram Manly, in right of his wife, administrator,) and William

JANUARY TERM, 1849. 661

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Statement of Case.

D. Moseley, administrator *de bonis non* of Samuel Parkhill, deceased, to recover the amount of a sealed note of defendant's intestate, of which the following is a copy:

"Dolls. 94,182 22-100.        Tallahassee, Dec. 9, 1840.

"Six months after date I promise to pay to the Union Bank of Florida at their Banking house in the City of Tallahassee, ninety four thousand one hundred and eighty two 22-100 Dollars, for value received, for securing payment whereof I do hereby pledge my shares in the capital stock of said Bank.

SAMUEL PARKHILL, [Seal.]

The declaration is in debt, and contains a special count on the note, and common count for *money had and received.*

The defendants filed various pleas as follows:

And the said defendants, as administrators and administratrix *de bonis non* as aforesaid, by J. T. Archer, their attorney, come and defend the wrong and injury when, &c., and as to the first count in the declaration say, that the said supposed writing obligatory is not the deed of the said Samuel Parkhill, deceased, and of this they put themselves upon the country, &c.

And for further plea in this behalf, the said defendants, as administrators and administratrix *de bonis non* as aforesaid, say *actionem non*, &c., as to the second count in the declaration, because they say that the said Samuel, in his life time, was not indebted to the said plaintiff, in manner and form as in the said second count·is alleged, and of this they put themselves upon the country, &c.

And for further plea in this behalf, the said defendants, as administrators and administratrix *de bonis non* as aforesaid, say *actio non*, &c., as to the first count in the said declaration mentioned, because they say that, before the institution of this suit, to wit, on the first day of January, in the year of our Lord one thousand eight hundred and forty-four, to wit, at the county of Leon aforesaid, Martha Ann Manly, administratrix, and Hiram Manly, administrator, in right of his wife, said Martha, of the estate of said Samuel, which remained at his death, paid to the said plaintiff the said sum of ninety-four thousand dollars, in the said writing obligatory mentioned, together with all interest then due thereon, according to the form and effect of the said writing obligatory; and this the said defendants, as administrators and administratrix *de bonis non* as aforesaid, are ready to verify: wherefore, they pray judgment whether the said plaintiff ought to

have or maintain their aforesaid action thereof against them, &c., by reason of any thing in the first count mentioned.

And for further plea in this behalf, the said defendants say *actionem non*, &c., because they say that the said plaintiff before and at the time of the commencement of this suit, to wit, at the county aforesaid, was and still is indebted to the said defendants, as administrators and administratrix *de bonis non* as aforesaid, in a large sum of money, to wit, in the sum of three hundred thousand dollars, for the proceeds of the sale by the said plaintiff of one thousand four hundred and twenty-eight shares of capital stock in the Union Bank of Florida of the said Samuel deceased, before that time sold by the said plaintiff, on account of the said Martha Ann, as administratrix, and the said Hiram, as administrator, in right of his wife, said Martha, of the estate of said Samuel which remained at his death, which said sum of money has never been paid by the said plaintiff to the said Martha Ann and Hiram, as administratrix and administrator as aforesaid, or to these defendants, as administrators and administratrix *de bonis non* as aforesaid. And the said defendants further say that the said plaintiff, at the time of the commencement of this suit, to wit, at the county aforesaid, was and still is indebted to the said defendants, as administrators *de bonis non*, &c. as aforesaid, in the further sum of three hundred thousand dollars, for divers goods, wares and merchandizes sold and delivered to the said plaintiff, and at the request of the said plaintiff, by the said Martha Ann and Hiram Manly, administratrix and administrator as aforesaid, of the estate of said Samuel which remained at his death; and for money by the said Martha Ann and Hiram, as administratrix and administrator as last aforesaid, before that time lent and advanced to, and paid, laid out and expended for the said plaintiff, and at the request of the said plaintiff; and for money by the said plaintiff before that time had and received, to and for the use of the said Martha Ann and Hiram Manly, as administratrix and administrator as aforesaid; and for money due and owing from the said plaintiff to the said Martha Ann and Hiram Manly, as administratrix and administrator as last aforesaid, upon an account stated between them; and the said defendants further saith that the said plaintiff before and at the time of the commencement of this suit, to wit, at the county aforesaid, was and still is indebted to the said defendants, as administrators and administratrix *de bonis non* as aforesaid, in the further sum of three hundred

thousand dollars, for money by the said defendants, as administrators and administratrix *de bonis non* as aforesaid, before that time lent and advanced to, and paid out and expended for the said plaintiff, and at the request of the said plaintiff; and for money by the said plaintiff before that time had and received, to and for the use of the said defendants, as administrators *de bonis non* as aforesaid; and for money due and owing from the said plaintiff to the said defendants, as administrators and administratrix *de bonis non* as aforesaid, upon account stated by them; which said sums of money, so due and owing to the said defendants, as administrators and administratrix *de bonis non* as aforesaid, exceed the debt and damages in the plaintiff's declaration mentioned, and out of which said sums due as aforesaid, the said defendants, as administrators and administratrix *de bonis non* as aforesaid, are ready and willing and hereby offer to set off and allow to the said plaintiff the full amount of the said debt and damages, and this the said defendants are ready to verify: wherefore, they pray judgment that so much of the said several sums of money above mentioned, as exceed the debt and damages in favor of the said plaintiff, be allowed to these defendants, according to the form of the statute in such case made and provided.

And for further plea in this behalf, the said defendants say *actionem non*, &c., because they say that they have fully administered all and singular the goods and chattels, rights and credits, lands and tenements, which were of the said Samuel Parkhill, deceased, at the time of his death, and which ever came to the hands of these defendants, as administrators and administratrix *de bonis non* as aforesaid, to be administered, to wit, at the county aforesaid; and that they, the said defendants, have not, nor on the day of the commencement of this suit, or at any time since, had they any goods or chattels, lands or tenements, which were of the said Samuel Parkhill, deceased, at the time of his death, in the hands of these defendants, as administrators and administratrix *de bonis non*, to be administered, and this the said defendants are ready to verify: wherefore, they pray judgment whether the said plaintiff its action thereof against them ought to have or maintain, &c.

And for further plea in this behalf, the said defendants say *actio non*, &c., because they say that heretofore and before the grant of letters of administration *de bonis non* to these defendants, and before the marriage of the said Hiram Manly and Martha Ann Manly, and

before the institution of this suit, to wit, on the fourth day of April, in the year of our Lord one thousand eight hundred and forty two, at the county aforesaid, one Henry Bond impleaded the said Martha Ann Manly, (then Parkhill) as administratrix of the estate of said Samuel which remained at his death, before the Superior Court of the Middle District of the Territory of Florida in and for the county of Leon, in an action of trespass on the case on promises for and on account of certain promises and assumptions by the said Samuel Parkhill in his life time made to the said Henry Bond, and proceedings were so far had therein that afterwards and before the marriage with said Hiram Manly by said Martha Ann Parkhill, and before the commencement of this suit, to wit, on the fifth day of May in the year last aforesaid at the spring term of the Superior Court aforesaid, to wit, at the county aforesaid, the said Henry Bond, by the consideration and judgment of the said Court recovered against the said Martha Ann Manly, (then Parkhill) as administratrix, as aforesaid, the sum of twelve thousand four hundred and forty six dollars and fourteen cents for his damages which he had sustained by occasion of the non-performance by said Samuel in his life time, and said Martha Ann as administratrix as aforesaid, after his death, of the said promises and undertakings, so by the said Samuel in his life time made to the said Henry Bond, to be levied of the goods and chattels, slaves, lands, and tenements of said Samuel Parkhill, deceased, in the hands of the said Martha Ann Manly, (then Parkhill), to be administered, whereof the said Martha Ann, as Administratrix as aforesaid, was convicted, as by the record and proceedings thereof, remaining in the Circuit Court of the Middle Circuit of the State of Florida in and for the County of Leon, more fully and at large appears, which said judgment against said Martha Ann, as administratrix, as aforesaid, is still of force, and not paid, satisfied, vacated, cancelled or reversed, and the said defendants as administrators and administratrix *de bonis non*, as aforesaid, further say, that they have fully administered all and singular the goods and chattels, rights and credits, lands and tenements, which were of the said Samuel at the time of his death, and which ever came to the hands of these defendants, as administrators *de bonis non*, as aforesaid, to be administered, to wit, at the county aforesaid, except goods and chattels of small value, to wit, of the value of five dollars ; and that they, the said defendants, as administrators and administratrix *de bonis non*, as aforesaid, have not, nor on the day of

JANUARY TERM, 1849. 665

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Statement of Case.

the commencement of this suit, or at any time since, had they any goods or chattels, lands or tenements, which were of the said Samuel, deceased, at the time of his death, in their hands as administrators and administratrix *de bonis non*, as aforesaid, to be administered, except goods and chattels of the value aforesaid, and which are not sufficient to satisfy the judgment aforesaid and are liable for the payment of the same : And this they are ready to verify. Wherefore they pray judgment whether the said plaintiff ought to have or maintain their action aforesaid against the said defendants as administrators and administratrix *de bonis non* as aforesaid, &c.

And for further plea in this behalf, the said defendants say *actionem non*, &c., as to first count, because they say that the sole consideration for which the' said writing obligatory was given by the said Samuel, was the loan by the said plaintiff to the said Samuel, of ninety thousand one hundred and seventy seven 34-100 dollars, in notes of the Union Bank, calling for that sum, but then greatly depreciated, and that thereby the said plaintiff did knowingly, wilfully take and receive, and insist upon a greater rate of interest than eight per centum per annum, contrary to and in violation of the provisions of charter of the said Union Bank : And this the said defendants are ready to verify, &c. Wherefore they pray judgment whether the said plaintiff ought to have or maintain its action thereof against these defendants as administrators and administratrix *de bonis non*, as aforesaid, by reason of any thing in the first count mentioned.

The plaintiff moved to strike out the first plea of the defendants, but afterwards joined issue thereon.

To the second plea, the plaintiff demurred, but afterwards joined issue thereon.

To the third, fourth, and fifth pleas, the plaintiff tendered issue upon the facts, which was joined by the defendants.

To the sixth plea the plaintiff filed a replication as follows :

And the said plaintiff, as to the said plea of the said defendants by them sixthly above pleaded, saith that he the said plaintiff, by reason of anything in the said plea alleged, ought not to be barred from having and maintaining his aforesaid action thereof against him, because he says that the said judgment in the said plea mentioned was obtained against the original administrator and administratrix of Samuel Parkhill, deceased, and that the same is in no wise binding upon the said defendants in this present suit, administrators and ad-

ministratrix *de bonis non* of the said Samuel, and that the said defen-dants, administrators and administratrix *de bonis non* of the said Samuel, have not fully administered all and singular the goods and chattels which were of the said Samuel Parkhill, deceased, at the time of his death, and which came to their hands to be administered, but that they the said defendants,.at the commencement of this suit administrators and administratrix *de bonis non*, as aforesaid, had goods in their hands to be administered, of the estate of the said Samuel, over and above the said amount admitted in the said plea, and more than sufficient to pay and satisfy the debt of the said plaintiff above declared, and the damages on the same, and wherewith the said defendants might and could have satisfied the same : And this the said plaintiff prays may be enquired of by the country, &c.

The defendants joined the issue tendered by this replication.  To the seventh and last plea, the plaintiff demurred, but by leave of the Court the defendants were permitted to amend the last plea, and did so amend by filing in lieu thereof on the 29th June, 1847, the following amended plea :

And for further plea, &c., said defendants come and defend, &c., when, &c., and say *actio non*, &c., because they say that the said supposed writing obligatory is not the act and deed of their intestate the said Samuel, in his life time, but the same is and was when the same was made, sealed and delivered to the said Union Bank of Florida, wholly null, illegal, and void, and is and hath been at all times since, wholly illegal, null and void, because the same was made and delivered for the sole and only consideration of a loan of money from said Union Bank of Florida to said Samuel in his life time, (he being then and there a stockholder, and the same being on a pledge of his stock) and that upon the said loan the said Bank wilfully and know-ingly reserved and took more than the lawful rate of interest allowed to said Bank to take upon such loans, to wit, the sum of one hundredth of one per cent. interest per annum beyond the amount allowed by said charter and law upon the said loan of and from said Samuel in his life-time, contrary to the form of the statute in the case of the Union Bank made and provided, and against the form and letter of its char-ter and powers, and transcending and going beyond and violating the same, to wit : at the time and place of the delivery of the bond in the declaration mentioned : And this they are ready to verify.

JANUARY TERM, 1849. 667

Union Bank *vs*. Parkhill's Adm'rs—cross writs of error.—Statement of Case.

Wherefore they pray judgment whether the said plaintiff ought to have or maintain its action aforesaid against these defendants.

On the same day the plaintiff demurred to the amended plea, and after argument, the demurrer was sustained by the Court.

The cause was afterwards tried before His Honor Judge BALT-ZELL, upon the issues joined, which were submitted to a jury duly empanneled for this purpose. On the 13th July, 1847, a verdict was returned and judgment entered, as follows :

The jury empannelled in this cause this day returned into Court, and upon their oath do say : " We the jury find for the plaintiff $143,782 81-100, and no assets in the hands of the administrators." Therefore it is considered by the Court, that the plaintiff recover against the defendants $188,364 44-100, the debt in the declaration mentioned, and its costs by it about its suit in this behalf expended, to be levied of the goods and chattels, slaves, lands and tenements of the defendant's intestate, when assets sufficient therefor shall come to the hands of the said defendants. But this judgment is to be discharged by the payment of the sum of one hundred and forty-three thousand seven hundred and eighty-two dollars and eighty-one cents, ascertained by the jury as aforesaid and the costs, and the said defendants in mercy, &c.

At the trial of this cause, the plaintiff excepted to various rulings of the Court, which exceptions were noted in the following bill of exceptions filed by the plaintiff :

Be it remembered, that on this 13th day of July, in the year of our Lord one thousand eight hundred and forty seven, this cause came on to be tried upon the issues joined, and thereupon the plaintiff offered in evidence to the jury the bond sued upon, to wit :

Dolls. 94,182 22-100. Tallahassee, Dec. 9th, 1840.

Six months after date I promise to pay to the Union Bank of Florida at their Banking House in the City of Tallahassee, Ninety four thousand one hundred and eighty two 22-100 dollars for value received : for securing payment whereof I do hereby pledge my shares in the capital stock of said Bank. Witness my hand and seal.

SAMUEL PARKHILL, [L. S.]

which was read to the jury without objection. It was admitted by the plaintiff's counsel that the instrument was a Stock Bond evidencing a loan made under the 29th section of the charter or act of incorporation of the said plaintiff.

35

The charter of the Union Bank and the several amendments thereto, were offered in evidence by the said plaintiff: And it was expressly admitted by defendant's counsel that the requisitions of the act of incorporation had been complied with, and that the Bank had gone into operation under authority thereof.

The said plaintiff, further to maintain the issues joined, offered to the Jury the inventories and appraisements filed by the defendant Moseley, in the office of the Judge of Probate for Leon County.

These inventories and appraisements, were read to the jury, and embrace items as follows :

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Slaves, | - | - | - | - | - | - | $75,925 |
| Bonds, | - | - | - | - | - | - | 3,142 60 |
| Cash, | - | - | - | - | - | - | 373 47 |

$79,441 07

The said plaintiff also introduced and offered in evidence the audit by the Judge of Probate of Leon County, of the account of the defendant, William D. Moseley, up to 1st April, 1846, to wit :

ACCOUNT AUDITED TO THE 1ST OF APRIL, A. D., 1846.

DR.    *William D. Moseley, administrator de bonis non, in account with the estate of Samuel Parkhill, deceased.*

I find this administrator chargeable for the following amounts, viz : For notes and bonds, as per his inventory filed 15th January, 1845,                                                                            $3,142 60

Cash received from J. G. Gamble,                                   373 47

Inventory 16 slaves, filed June 22, 1844, appraised at          4800 00

Inventory of 93 slaves, filed January 4, 1845,
appraised at                                     $27,850

Inventory of 112 slaves, filed
January 4, 1845, appraised at        $37,275
Less error in addition,                    100          37,175   69,825 00

Inventory of 13 slaves, filed 4th January, 1845, appraised
at                                                                4,000 00

Balance of hires at Springwood, as reported on account
of administrator, filed 8th April, 1846, due January 1,
1846,                                                              861 88

Rent of Springwood plantation for the year 1845, due
1 January, 1846,                                                   125 00

Hires of negroes at Tallahassee, on 27th January, 1845, (after deducting the time from the date of levy, &c., as reported in the administrator's account, filed 8th April, 1846,) due January 1, 1846,   1,793 09

     $80,121 04

CR.

I find this administrator entitled to allowance on this account as follows, viz :

For the appraised value of slave Celia, who died on the 4th January, 1845,   $500 00

For the appraised value of Cuba, a slave who died on the 10th January, 1845,   100 00

For amount claimed on his account, filed 8th April, 1846, on vouchers No. 1 to No. 23, inclusive,   $2,433 90

Less for the following amounts, viz :

Voucher 10 suspended, not being filed,   $2 25

Voucher 11 suspended, not being filed,   1 00

Voucher 12 suspended, not being filed,   2 00

Voucher 13, amount paid H. Manly, on account of wife's dower, suspended for evidence that dower has been decreed to her,   658 60

Voucher 18, payment to J. T. Archer suspended, his receipt not being the proper voucher,   51 00

Voucher 20, suspended in part, say amount p'd H. Manly for bill of D. Mc-

**670** SUPREME COURT.

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Statement of Case.

| | | | |
|---|---|---|---|
| Raeny, Clerk, the same being improperly paid by this administrator, | 32 14 | | |
| Voucher 22, paid H. Manly, on account of wife's dower, suspended for evidence that dower has been decreed to her, | 560 24 | 1,307 23 | 1,126 67 |
| For 184 slaves, sold by John G. Camp, Marshal, for the disbursement of which, the vouchers are not yet filed, carried down to new account, | | 57,133 00 | |
| Less error in Marshal's addition, | | 100 00 | 57,033 00 |

| | | |
|---|---|---|
| For excess of appraisement over sales of 184 slaves, sold by John G. Camp, Marshal, | | 192 00 |
| For appraised value of slaves, remaining on administrators account, undisposed of, carried down, | | 16,000 00 |
| Balance carried down as cash on 1st April, 1846, subject to commissions and suspended items, when sustained, | 5,169 37 | $80,121 04 |

1846.

| | | |
|---|---|---|
| April 1. | Balance of appraisement brought down, | 16,000 00 |
| | Amount of sales by marshal, for which vouchers are not yet filed, brought down, | 57,033 00 |
| | Balance as cash on hand this day, subject to commissions and suspended items, when sustained, | 5,169 37 |

Settled—July 2, 1847.                                    $78,202 37

JAMES E. BROOME,
*Judge of Probates.*

The foregoing account and vouchers are examined, and as audited, are approved, allowed and admitted to record.

JAMES E. BROOME,

*Judge of Probates.*

JULY 2, 1847.

Which was read in evidence to the jury, and here the plaintiff rested his cause.

Defendants by their counsel then offered in evidence the entry of judgment in favor of the Union Bank of Florida against Martha Ann Manly, and Hiram Manly, in right of his wife, administrators of Samuel Parkhill, deceased, which judgment was founded upon the same cause of action as the present case—the execution issued thereon, and the report of the sale made under said execution, by John G. Camp, Marshal of the Middle District; and plaintiff admitted that the slaves so sold by Camp, Marshal, were, to that extent, the identical slaves in the inventory mentioned—which judgment, execution, levy and report of sale are in these words, to wit:

At a Circuit Court for the County of Leon, continued and held at the Court House in the City of Tallahassee, on Saturday, the 1st day of March, A D., 1845. Present, the Honorable SAMUEL J. DOUGLAS, Judge.

The Union Bank of Florida, plaintiff,

*vs.*

Martha Ann Manly, late Parkhill, and Hiram Manly, in right of his wife, Martha Ann, administrator of Samuel Parkhill, deceased, defendants.

In debt.

This day came the parties by their attorneys, and the plaintiff by his attorney filed his special demurrer to the defendant's rejoinder to the plaintiff's replication filed herein, to the defendant's amended plea *puis darrien* continuance, filed by leave of the Court, on the 24th February last, in which demurrer the defendants joined: whereupon the matters of law arising upon the plaintiff's demurrer to the said rejoinder being argued, it seems to the Court here, that the said rejoinder and the matters and things therein alleged are not sufficient in law to bar or preclude the plaintiff from having and maintaining its action aforesaid against the said defendants. Therefore it is considered by the Court, that the said plaintiff recover against the said defendant, the sum of $94,182 22-100, parcel of the debt in the declaration mentioned, and the sum of $27,982 65-100,

its damages, making together the sum of one hundred and twenty-two thousand one hundred and sixty-four dollars and eighty-seven cents, and its costs by it about its suit in this behalf expended, to be levied of the goods and chattels, slaves, lands and tenements of the said intestate, Samuel Parkhill, deceased, in the hands of the defendants to be administered, and the said defendants in mercy, &c.

THE TERRITORY OF FLORIDA.

*To all and singular the Marshals of said Territory—Greeting :*

We command you that of the goods and chattels, slaves, lands and tenements of Samuel Parkhill, deceased, in the hands of Martha Ann Manly, late Parkhill, and Hiram Manly, in right of his wife, said Martha Ann, administrators of Samuel Parkhill, deceased, re-maining to be administered, you cause to be made the sum of ninety-four thousand one hundred and eighty-two dollars and twenty-two cents, its debt, and also twenty-seven thousand nine hundred and eighty-two dollars and sixty-five cents, its interest and damages, making together the sum of one hundred and twenty-two thousand one hundred and sixty-four dollars and eighty-seven cents, which the Union Bank of Florida lately, on the 1st day of March, 1845, recovered in our Superior Court, for the County of Leon, in the Middle District, as well for its debt as its damages occasioned by the detention of said debt ; and likewise the sum of seven dollars and eighty-two cents, which to the said Union Bank of Florida in the same court adjudged for its costs by it in that behalf expended, together with lawful interest on said damages, from the rendition of said judgment till paid, and the costs of this writ and of your proceedings herein ; and that you have the said sums of money before the judge of our said court, at Tallahassee, when satisfied, to render the said Union Bank of Florida the sums aforesaid, and have then and there this writ. Witness Richard T. Birchett, clerk of our said court, at Tallahassee aforesaid, this 20th day of March, A. D., 1845, and of the independence of the United States the sixty-ninth year.

[SEAL.]          R. T. BIRCHETT, *Clerk.*

Came to hand 20th March, 1845, and levied on the following slaves :

[Here follows a list of slaves levied on, and a statement of the sale thereof by the marshal, for the nett sum of $55,173 64.]

To the admission of which evidence, the plaintiff, by its counsel, objected, but the Court overruled the objection and permitted the

same to be read in evidence; to which decision the plaintiff, by its counsel, excepted.

The said defendants, by their counsel, then offered in evidence nine mortgages executed by Samuel Parkhill in his life time, to the Union Bank of Florida, to secure his subscription of shares in the said Bank, to wit:

Memorandum of Samuel Parkhill to the Union Bank of Florida, 19*th March*, 1835.

North East quarter Sec. 3, T. 1; East half North West quarter, Sec. 3, T. 1; West half North West quarter, Sec. 2, T. 1; South East quarter Sec. 34, T. 2, R. 2, North and East; East half South West quarter Sec. 34, T. 2, R. 2, North and East; West half North East quarter Sec. 34, T. 2, R. 2, North and East; South West quarter Sec. 35, T. 2, R. 2, North and East.

For fifty shares, 50

1*st February*, 1837.

North West quarter Sec. 31, T. 1, R. 4, North and East; East half South East quarter Sec. 31, T. 1, R. 4, North and East; East half South East quarter Sec. 36, T. 1, R. 3, North and East; West half South West quarter Sec. 31, T. 1; R. 4, North and East; West half South East quarter Sec. 36, T. 1, R. 3, North and East. Slaves Hemady, Poll, Elias, Sarah, Hagar, Elizabeth, Sam, Johnny, Juba, Jane. For sixty shares, 60.

(*Note*—The land with 31 shares transferred to H. J. Mills.)

7*th March*, 1838. Remortgage of the property in the two preceding mortgages for forty one shares, 41.

(*Note*—13 shares transferred to H. J. Mills.)

16*th May*, 1838.

North East quarter Sec. 33, T. 2, R. 2, North and East; East half North West quarter Sec. 33, T. 2, R. 2, North and East; North West quarter Sec. 34, T. 2, R. 2, North and East; South East quarter Sec. 33, T. 2, R. 2, North and East; South half Sec. 34; South West quarter Sec. 35; West half North West quarter Sec. 2, T. 1, R. 2. North and East; North East quarter Sec. 3, T. 1, R. 2, North and East; East half North West quarter Sec. 3, T. 1, R. 2, North and East.

Slaves—Caesar, York, John, Toney, Bristo, Frederick, Elias, Claiborn, Dick, Bob, Johnny, William, Old Tom, Ned, Albert, Dany, Frank, John, Sy, Lisbon, Ben, George, William, Primus, Ellick,

George, Jim, Toney, Harris, Toney, Cuff, York, Dick, Cuba, Amy, Grace, Abram, Rose, Malinda, Francis, Beck, Juba, Fillis, Chloe, Amy, Francis, Susanna, little Juba, Jane, Margaret, Frank, Mahala, Julia, Louisa, Rachel, Ellen, Matilda, Caroline, Celia, Maria, Nancy, Winny, Minica, Eddy, Kitty, Fillis, Hester, Amy, Israel, Sibby, Scipio, and Long Mary, for four hundred and seventy shares. 470.

(*Note*—105 shares transferred to the Prest. U. Bk. of Florida.)
16th May, 1838.

West half South West quarter Sec. 1, T. 2, R. 1, North and West; South half Sec. 2, T. 2, R, 1, North and West ; South East quarter Sec. 3, T. 2, R. 1, North and West ; West half North West quarter Sec. 3, T. 2, R. 1, North and West ; Lot 1, Sec. 4, T. 2, R. 1, North and West ; Lots 1 and 5, Sec. 9, T. 2, R. 1, North and West; North half Sec. 10, T. 2, R. 1, North and West ; South East quarter Sec. 10, T. 2, R. 1, North and West ; East half South West quarter Sec. 10, T. 2, R. 1, North and West ; Fractional Sec. 11, T. 2, R. 1, North and West ; Frac. Sec. 14, T. 2, R. 1, North and West ; Frac. Sec. 15, T. 2, R. 1, North and West ; Lot 1, Sec. 21, T. 2, R, 1, North and West ; Lots 1 and 2, Sec. 22, T. 2, R. 1, North and West.

Slaves—John, William, Edmund, Wilson, little Wilson, Pitman, Sam, Henry, Rochester, Israel, Daniel, Richard, Tom, Eliza, Polly, Nancy, Matilda, Barbara, Spotswood, Peggy, Mary, Daniel, Penny, Rachel, Emily, George, Phil, Billy, Frederick, Hemady, Ned, Jack, Morgan, Anthony, Gully, Jack, Tom, Hackney, Tom Gander, Sam, Homady, Primus, Isaac, John, Dolly, Sarah, Hagar, Elizabeth, Fanny, Morgianna, Martha Ann, Mary, Molly, Margaret, Diana, Ellen, Elizabeth, Sam, Sarah, for six hundred and ninety shares. 690.

(*Note*—93 shares transferred to the Prest. of the U. Bk. of Flo.)
20th May, 1838.

South West quarter Sec. 3, T. 2, R. 1, North and West; East half North West quarter Sec. 3, T. 2, R. 1, North and West; West half North East quarter Sec. 2, R. 1, North and West ; Lot 6, Sec. 4, T. 2, R. 1, North and West ; Lots 2, 3, 6, and 7, Sec. 9, T. 2, R. 1, North and West ; Lot 8, Sec. 4, T. 2, R. 1, North and West; for one hundred and one shares,                   101
15th May, 1839.

Gabriel, William, Squire, George, Isaac, Jacob, Keeling, Jack, Moses, York, Albert, Adeline and child, Martha, Ann and two chil-

dren, Mary and child, Clarissa, Sarah and child, Billy, Mariah and child, Francis, Goodwin, Ann and child, Queen and child, Hannah, and child, Eliza, Emily, Rachel, Margaret, Fenton, Radney, Jane, Kitty, Judy, Patty, Jacob, Jim, Peter, Gabriel, Dick, Daniel, Harkless, Harriet, Walker, Willy, George, Nancy B. and child, Maria and child, Patsy, Cely, Nancy Burwell, for two hundred shares. 200.
*January 15th,* 1840.

Slaves—Sey, Kitty, for five shares.                     5.
*29th February,* 1840.

West half South East quarter Sec. 29, T. 2, R. 3, North and East; South East quarter South East quarter Sec. 30, T. 2, R. 3, North and East; South East quarter North East quarter Sec. 30, T. 2, R. 3, North and East, for eight shares.        8.

| | | |
|---|---:|---|
| 19th March, 1835, | 50 | shares. |
| 1st Feby., 1837, for 60 shares transfer 31 to Mills, | 29 | " |
| 7th March, 1838, for 41 shares, transfer to Mills, 13 | 28 | " |
| 16th May, 1838, 470 transfer to Pres. Union Bank, 105 | 365 | " |
| 16th May, 1838, 690 transfer to Pres. Union Bank, 93 | 597 | " |
| 20th May, 1838, | 101 | " |
| 15th May, 1839, | 200 | " |
| 25th Jan. 1840, | 5 | " |
| 29th Feb. 1840, | 8 | " |

                                                    1383 shares.

*Union Bank of Florida,* 15th July, 1847.

C. G. ENGLISH,

*Solicitor Union Bank.*

To the admission of which evidence the plaintiff, by its counsel, objected, but the Court overruled the objection and allowed the same to be read in evidence, to which decision, the plaintiff excepted.

The said defendants, by their counsel, then offered in evidence a deed of mortgage of certain slaves named in said inventories and appraisement, executed by said Samuel in his life time, dated the —— day of —— A. D. 18    and proved that said Mortgage was in suit

36

for foreclosure in this Court, plaintiff's and counsel admitted that the same was assigned and in fact belonged to other persons than the Bank, which deed of mortgage is in these words :

*This Indenture*, made and entered into this 19th day of October in the year of our Lord one thousand eight hundred and forty, between Samuel Parkhill of the County of Leon in the Territory of Florida, of the *first* part and the Union Bank of Florida of the *second* part: Whereas the said Samuel Parkhill is justly indebted to the said Union Bank of Florida in several sums of money as follows, to wit:

1. In a certain Bill of exchange dated 29th August, 1839, payable at ninety days after the fourth day of November, 1839, drawn on Hamilton & Co. of New York, in favor of William H. Brodie, for twenty-five thousand dollars, which bill, at request of said Parkhill, was not forwarded for acceptance and payment; and on which there is endorsed a payment of nine thousand three hundred and fifty dollars, as on the 22d February 1840.

2. Also a certain note payable to order of John Parkhill, Esq., Cashier, dated 28th August, 1839, and payable at ninety days from the 24th October, 1839, for twenty thousand dollars, upon which note there is endorsed, July 18, 1840, a payment of three thousand nine hundred and twenty three 58-100 dollars.

3. Also a bill of exchange dated 8th February 1837, drawn on Hamilton & Cole, of New York, by William H. Brodie, in favor of and endorsed by said Samuel Parkhill, for the sum of ten thousand five hundred dollars, payable six months after date, which bill was accepted by said Hamilton & Cole, and protested for non-payment.

4. Also one other note dated 24th April 1839, for fifteen thousand dollars, signed by said Saml. Parkhill, and endorsed by William P. Craig, and payable eight months after date, upon which said note, the following payments are endorsed, to wit: on 21st January, 1840, the sum of ten thousand dollars, and on the 1st January 1840, the sum of one thousand and ninety nine 35-100 dollars.

5. Also a bill of exchange dated 22d March, 1837, drawn by Wm. P. Craig in favor of, and endorsed by, Saml. Parkhill, upon Maitland, Kennedy, & Co., at four months after date, for five thousand two hundred dollars, which bill was protested for non-payment.

6. Also a certain promissory note dated January 4th 1840, payable to, and endorsed by R. H. Berry, payable ninety days after date, for fourteen hundred and forty three 58-100 dollars.

7. Also a certain note dated January 10th, 1840, payable to, and endorsed by, John Parkhill, payable ninety days after date, for the sum of six thousand dollars.

8. Also a certain other note dated 18th March, 1840, payable sixty days after date to the order of William P. Craig, and endorsed by him for the sum of ten thousand dollars.

9. Also a certain other note signed by said Samuel Parkhill, dated January 19th, 1840, payable ninety days after date, to the order of and endorsed by John Parkhill, for the sum of five thousand dollars.

10. Also a certain other note signed by said Samuel Parkhill, dated February 1st 1840, payable ninety days after date, to the order of, and endorsed by, John Parkhill, for five thousand dollars.

11. Also one other note dated October 19th 1840, and payable to the Union Bank of Florida, or its assigns, on demand, for the sum of thirteen thousand two hundred dollars.

And whereas, the said Samuel Parkhill is desirous of installing the payment of said debts, notes and bills of exchange, so as to pay thereof twenty-five thousand dollars on or before the first day of April in the year one thousand eight hundred and forty one, and to pay annually thereafter, on or before the first day of April in each succeeding year, the further sum of fifteen thousand dollars, until the whole of said debts with the interest thereon, shall have been duly paid and discharged : And whereas, the said Samuel Parkhill is desirous to secure the payment of said notes, bills, and debts, at the times and in the sums before stated : Now this Indenture witnesseth, that for and in consideration of the premises, and in further consideration of the sum of one dollar to him in hand paid by the said Union Bank of Florida, the receipt whereof at and before the sealing and delivery of these presents, is hereby acknowledged, the said Samuel Parkhill hath granted, bargained, sold and transferred, and by these presents doth grant, bargain, sell and transfer unto the said Union Bank of Florida, and to its assigns, the following slaves, together with the future increase of the females thereof, to wit : Prisley, 40 years; Lucy, 45 ; Mary, 17 ; Asia, 40 ; Henry, 10 ; Susannah, 35 ; Nancy Eppes, 17 ; Nancy Dowdy, 18 ; Ailsey, 28 ; Francis Smith, 17 ; Melinda, 16 ; Lucy, 18 ; Priscilla, 12 ; Ann Eliza, 16 ; Rosetta, 14; Rachel, 16 ; Martha, 8 ; Phillis, 25, and child ; Dick, 30 ; which before named slaves were mortgaged to the said Union Bank of Florida on the 6th November 1839, to secure the payment of the first

678 SUPREME COURT.

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Statement of Case.

described bill of exchange, for twenty-five thousand dollars. Also the following other slaves and the future increase of the females thereof, to wit : Diana Clark, 24 ; Little William, 10 ; Martha, 9 ; Webb, 18 ; Irven, 18 ; Dick Petersburg, 17 ; Beckey, 20 ; Edmund, 40 ; Patsey, 18 ; William Cary, 15 ; Henry, 11 ; Sarah Dawes, 15 ; Willis, 15 ; Jerry, 18 ; Henry, 18 ; Diana Brooks, 20, a daughter of Diana, 8 ; Black Ellen, 12 ; Smart, 35 ; Little Rosetta, 12 ; Gabriel, 12 ; Daniel, 12 :· To have and ·to hold the said slaves, unto the said Union Bank of Florida, and to its assigns forever : Yet upon this condition, that if the said Samuel Parkhill, his heirs, &c., shall well and truly pay the debts herein before described by payment of the several instalments described, at the times when the same shall become due and payable, then this indenture shall be null, void, and of no effect, else shall remain in full force and virtue. In witness whereof the said Samuel Parkhill hath hereunto set his hand and affixed his seal on the day and year first above written.

SAMUEL PARKHILL, [Seal.]

Signed, Sealed, and delivered in presence of

HENRY L. RUTGERS,

J. RICHARDSON, JR.

To the admission of which evidence the plaintiff by its counsel objected, but the Court overruled the objection and allowed the same to be read in evidence to the jury ; to which decision the plaintiff excepted.

The said defendants then called James T. Archer, who, being duly sworn in this behalf, deposed as follows, viz :

In consequence of an advertisement in the month of November, 1843, attended a sale before the banking house of the plaintiff, of (1428) fourteen hundred and twenty-eight shares of stock sold by the Union Bank of Florida—it was sold as the property of Samuel Parkhill, deceased, and was bid off by Col. John G. Gamble at one cent per share, premium ; some directions were given at the sale, but does not distinctly recollect what they were. Being *cross-examined,* said, does not know whether the sale was ever completed or not, does not know what was done after that. Does not recollect the terms of the sale which were announced ; it was cried by Henry L. Rutgers, an officer of the bank. Being *re-examined,* says, he was the attorney for the estate of Parkhill, and attended said sale as such, in

consequence of seeing the advertisement—does not know whether any credit was given to the estate on account of the stock.

Defendants then called Charles G. English, who being duly sworn in this behalf, deposed as follows:  This statement which I have prepared as a statement of the original discounts for Samuel Park-hill on account of loans on pledge of stock, and the renewals of the same, of which the bond in suit is the last renewal, to wit:

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Statement of Case.

*Memorandum of Stock Notes discounted for*

| No. | Date of Entry. | Date of Note. | Note due. |
|-----|----------------|---------------|-----------|
|      | 7th April,      1835 |                        | 22d January, 1836 |
| 1757 | 31st August,      '36 | 31st August, 1836     | 22d January,      '37 |
| 2023 | 14th December,'36    | 25th December,'36     | 25th Decemb'r,'37 |
| 2199 | 26th January,   '37  | 25th Jan.,        '37 | 25th July,        '37 |
| 2248 | 8th February,   '37  | 10 February,      '37 | 10th April,       '37 |
| 2569 | 8th May,          '37 | 13th April,       '37 | 13th August,      '37 |
| 3429 | 12th April,       '38 | 28th Decemb'r,'37     | 28th June,        '38 |
| 3962 | 17th July,        '38 | 17th July,        '38 | 17th October,     '38 |
| 4013 | 29th July,        '38 | 24th July,        '38 | 24th October,     '38 |
| 4223 | 8th September, '38   | 17th July,        '38 | 27th Novemb'r,'38 |
| 4236 | 15th Sept'r,      '38 | 15th Septem.,    '38  | 14th Novemb'r,'38 |
| 4264 | 22d Sept'r,       '38 | 22d September,'38     | 22d October,      '38 |
| 4797 | 18th January,   '39  | 18th January,   '39   | 19th March,       '39 |
| 4883 | 5th February,   '39  | 5th February,   '39   | 6th April,        '39 |
| 4884 | "      "       "      | "       "       "     | "      "       " |
| 5179 | 10th April,       '39 | 9th April,        '39 | 9th October,      '39 |
| 5180 | "      "       "      | "       "       "     | "      "       " |
| 5181 | "      "       "      | 22nd March,       '39 | "      "       " |
| 5352 | 15th May,         '39 | 4th March,        '39 | 4th November, '39 |
| 6292 | 30th October,   '39  | 12th October,   '39   | 12th April,       '40 |
| 6293 | "      "       "      | "       "       "     | "      "       " |
| 6294 | "      "       "      | "       "       "     | "      "       " |
| 6460 | 13th December,'39    | 7th November, '39     | 7th May,          '40 |
| 7319 | 8th May,          '40 | 15th April,       '40 | 1st June,         '40 |
| 7320 | "      "       "      | "       "       "     | "      "       " |
| 7321 | "      "       "      | "       "       "     | "      "       " |
| 7407 | 2nd June,         '40 | 1st June,         '40 | 1st October,      '40 |
| 7408 | "      "       "      | "       "       "     | "      "       " |
| 7409 | "      "       "      | "       "       "     | "      "       " |
| 7410 | "      "       "      | 10th May,         '40 | 10th Septem.,   '40 |
| 7411 | "      "       "      | 4th June,         '40 | 4th October,      '40 |
| 7784 | 10th October,   '40  | 13th Septem.,   '40   | "      "       " |
| 7868 | 7th November, '40    | 7th October,      '40 | 6th December, '40 |
| 7869 | "      "       "      | "       "       "     | "      "       " |
| 7870 | "      "       "      | "       "       "     | "      "       " |
| 7871 | "      "       "      | "       "       "     | "      "       " |
| 7872 | "      "       "      | 4th October,      '40 | "      "       " |
| 8047 | 1st January,     '41 | 9th December, '40     | 9th June,         '46 |
| 8048 | "      "       "      | "       "       "     | 9th September, '41 |

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Statement of Case.

## S. Parkhill by the Union Bank of Florida.

| Amount. | Discount | N. Proce'ds | Date of Payment. | |
|---|---|---|---|---|
| 3,334 | Subs'ted for Prioleau's note 22d Jan. '36. | | | |
| 3,333 | 267 43 | 3,065 57 | 26th January,1837 | Arrear of inte- |
| 333 37 | 26 93 | 306 24 | 12th April, '38 | [rest 160 03 |
| 3,333 | 136 28 | 3,196 72 | " " | |
| 4,000 | 56 | 3,944 | 9th May, '37 | |
| 4,000 | 112 | 3,888 | 12th April, '38 | |
| 7,666 | 631 21 | 7,034 96 | 5th February, '39 | Arrear of inte- |
| 50,000 | 1,044 47 | 48,955 53 | " " " | [rest 317 76 |
| 12,300 | 256 93 | 12,043 07 | " " " | |
| 20,000 | 417 79 | 19,582 21 | " " " | Int. from 27th |
| 6,483 22 | 92 20 | 6,391 02 | " " " | [Aug. 1838 |
| 16,982 08 | 128 31 | 16,853 77 | 18th January, '39 | |
| 4,500 | 64 | 4,436 | 10th April, '39 | |
| 38,783 22 | 1,262 72 | 87,520 50 | " " " | |
| 7,666 17 | 109 03 | 7,557 14 | " " " | |
| 88,783 22 | 3,630 27 | 85,152 95 | 31st October, '39 | |
| 7,666 | 313 45 | 7,352 55 | " " " | |
| 4,500 | 201 | 4,299 | " " " | |
| 13,333 33 | 545 07 | 12,788 26 | 5th December, '39 | |
| 88,873 22 | 3,630 27 | 85,242 95 | 8th May, '40 | |
| 7,666 | 313 45 | 7,352 55 | " " " | |
| 4,500 | 184 | 4,316 | " " " | |
| 13,333 | 545 11 | 12,788 22 | 2d June, '40 | |
| 4,732 67 | 52 59 | 4,680 08 | " " " | |
| 88,783 22 | 986 45 | 87,796 77 | " " " | |
| 4,500 | 50 | 4,450 | " " " | |
| 533 | 14 70 | 518 30 | 7th November, '40 | |
| 4,732 67 | 130 43 | 4,602 24 | " " " | |
| 88,783 22 | 2,446 49 | 86,336 73 | " " " | |
| 13,333 33 | 367 40 | 12,965 93 | 10th October, '40 | |
| 4,500 | 124 | 4,376 | 7th November, '40 | |
| 13,333 33 | 74 08 | 13,259 25 | " " " | |
| 4,500 | 64 | 4,436 | 1st January, '41 | |
| 75,583 22 | 1,074 99 | 74,508 23 | " " " | |
| 13,333 33 | 189 63 | 13,143 70 | " " " | |
| 4,732 67 | 67 32 | 4,665 35 | " " " | |
| 533 | 7 95 | 525 05 | " " " | |
| 94,182 22 | 3,851 04 | 90,381 18 | | |
| 4,500 | 274 | 4,226 | 26th August, '45 | |

Interest was always required to be paid in advance, but it was not always so paid in advance. Samuel Parkhill's *stock notes* frequently lay over, as will be seen from the statement. Where a note would lie over for some time, and then be renewed, interest would be calculated from the maturity of the old note to the time of renewal, and then in advance upon the renewal for as long a period not more than twelve months, as the stockholder desired. *Cross examined.* By this operation, the bank would lose the profit upon the interest so deferred. Discount is the counting off the interest, and there is a difference between interest paid in advance, and interest paid after the lapse of the time. The bank would lose by the operation upon the interest. *Re-examined.* Proves resolution declaring Parkhill's stock forfeited, to wit : Copy of Resolution adopted by the Board of Directors of the Union Bank of Florida at their meeting 1st November 1843 : Resolved, that the shares of stock standing in the name of Samuel Parkhill on the books of the bank are forfeited by non-payment of interest, and that the same be advertised and sold as directed in the amendment of the charter of the bank passed, approved on the 1st March 1839, and subsequently accepted by the stockholders. Says that Rowlett's tables were always used by the bank ; by those tables, the days less than a month are calculated at 360 days to the year, the year is composed of three hundred and sixty-five days, and the months as aliquot parts of the year.

Defendants then called Henry L. Rutgers, who being duly sworn, deposed as follows : He has attended to the business in bank of renewing stock notes—the bank required the interest to be paid in advance, and so took it whenever it could get it—stock notes frequently lay over—when such was the case, the interest was paid from the time the note fell due, to the time of renewal, and as much interest in advance as the party was willing to pay, not exceeding twelve months interest.

Interest is always calculated in bank, for convenience, by Rowlett's tables ; by these tables, interest for days less than a month, is calculated at 360 days to the year. This is the only peculiarity. Does not recollect a case of an executor or administrator renewing a note in bank ; if any such had been offered, would have applied to the President for instruction—stock notes or bonds are discounted, and the interest taken in advance whenever the bank could get it. *Cross examined.* Says the notes of Samuel Parkhill frequently lay

JANUARY TERM, 1849.　　　　683

Union Bank *vs.* Parkhill's Adm'rs—cross writs of error.—Statement of Case.

over for some time—that pursuant to an advertisement, and under the amended charter of 1839, on the 18th November, 1843, the stock of Samuel Parkhill, consisting of thirteen hundred and eighty three shares, was offered for sale, and knocked off to John G. Gamble, at one cent per share, he having thereby the privilege to secure the shares, which was never done. The stock still continues to stand at the credit of Samuel Parkhill on the books of the bank—Colonel Gamble, who bid off the shares, did not pay the one cent per share, neither did he secure the stock according to the requisitions of the charter : in other words, he did not complete the purchase. Witness produced copy of the advertisement, to wit :

### UNION BANK SHARES.

By order of the Board of Directors of the Union Bank of Florida, the following shares in the capital stock of said bank will be offered for sale at public auction, to the highest bidder, before the front door of the banking house of said bank, in the City of Tallahassee, between the hours of 11 o'clock, A. M. and 3 o'clock, P. M., on Saturday, the 18th day of November, 1843, said shares being forfeited under the amended charter of said bank, for non-payment of interest upon stock notes, viz: Samuel Parkhill, 1,428 shares.

JOHN G. GAMBLE, *President.*

Tallahassee, Nov. 2, (7,) 1843.

*Re-examined.*—Said there were forty-five (45) shares of cash stock which were not offered for sale—they still remain at the credit of Samuel Parkhill—the bank had loaned forty-five hundred dollars, the full nominal value, on them. The stock offered for sale was bid off at one cent. per share. Being asked if he had never said the bidding was for one cent per share premium, answered he had, and by which he meant one cent per share, for the privilege of securing the nominal amount of the share by mortgage on lands and slaves. Being asked by defendant's counsel, if he had bid one cent per share for the shares, would he be entitled to a transfer of the shares, on payment of the one cent per share bid, he answered no—he would have to pay the one cent per share, and also secure the nominal amount of the shares by mortgage on lands and slaves, or pay the one hundred dollars per share, besides the one cent. That stock had been sold *bona fide* at 25 per cent. premium at sales by individuals, and sales on forfeiture by the bank—that in all the stock notes days of grace were added and the interest calculated, and as for four

37

days, and then were calculated by days. If the cash stock had been sold at one cent per share premium, the purchaser would have had to pay one hundred dollars, and one cent per share.

*Again cross examined.*—Said the board of stockholders kept a record or minutes of their proceedings—the proceedings of each meeting were signed by the chairman and countersigned by the secretary. The book shown him is the record book, or minutes of the stockholders proceedings. Reads to jury the minutes or record of a meeting held 4th January, 1840, accepting the amendment of the charter, passed in 1839, to wit:

At a meeting of the stockholders of the Union Bank of Florida, held on the 4th day of February, 1840, pursuant to adjournment, Mr. James Gadsden submitted the following resolution : *Resolved,* That the stockholders do approve and accept as part of their charter the amendment thereof, passed by the Legislative Council, and approved by the Governor of Florida, in the following words, viz:

An act to amend an act entitled an act to incorporate the subscribers to the Union Bank of Florida, approved 1st March, 1839.

SEC. 1. *Be it enacted by the Governor and Legislative Council of the Territory of Florida,* That, if any stockholder who has heretofore or may hereafter obtain a loan upon the pledge of stock, as is contemplated in the twenty-ninth section of the act to which this is an amendment, shall neglect to renew or pay up his stock note, for the space of thirty days after the same shall have become due, the shares so pledged shall be forfeited to the bank, and any premium that may be received from the sale thereof shall accrue and be added to the surplus profits of the bank.

SEC. 2. *Be it further enacted,* That it shall be the duty of the Board of Directors, when any share may be forfeited as aforesaid, to proceed to sell the same at public outcry to the highest bidder, before the banking house in the City of Tallahassee, after giving ten days' notice, by publication in all the papers published in Tallahassee, of the time and place of sale, and the purchaser shall, within ten days thereafter, execute to the bank the bonds and mortgages necessary to constitute him a stockholder, and be subject to the same rules, regulations and restrictions, and to be entitled to the same rights, privileges and immunities as are guarantied to an original stockholder : *Provided,* That the sale and forfeiture of shares shall not operate to divest the bank of any lien which it may have had on

JANUARY TERM, 1849. 685

Union Bank *vs.* Parkhill's Adm'rs—cross writs of error.—Statement of Case.

the property of the defaulting stockholder, but the same shall remain bound for the security of any debt he may owe the bank, whether as payer, endorser, or surety, until the same shall have been fully satisfied.

On this resolution, much debate ensued—after which, Mr. Richard H. Long called for the ayes and noes on its passage, when the following vote was taken :

*Ayes.*—Messrs. R. W. Alston, R. C. Allen, J. G. Anderson, H. W. Braden, T. A. Bradford, R. H. Bradford, Edward Bradford, E. E. Blackburn, S. J. Baker, Wm. Bailey, T. M. Bush, Bruton & Zeigler, T. P. Chaires, W. P. Craig, John A. Craig, J. W. Dabney, C. H. Dupont, A. F. Duval, F. Eppes, F. Fitzgerald, J. G. Gamble, Robert Gamble, James Gadsden, A. M. Gatlin, S. Parkhill, C. Rouse, H. V. Snell, J. B. Taylor, Richard Van Brunt, T. B. Watson, George T. Ward, J. M. Gilchrist, I. R. Harris, A. F. Holmes, John Judge, J. W. Lea, Thomas Livingston, J. H. T. Lorimer, Banks Meacham, J. C. McGehee, John Miller, J. G. McMillan, R. K. West, D. C. Wilson, W. Wyatt, A. Myrick, B. F. Whitner, Robert W. Williams.

*Noes.*—Thomas Brown, R. Hayward, L. G. Lamb, Richard H. Long, M. C. Livingston, John N. Partridge, and Jacob Robinson, who voted in this our right as stockholders, and in virtue of their premises, the vote stood 10,027 votes for the resolution, and 353 votes against it.

Mr. Richard H. Long asked leave to file a protest against the resolution, which was granted.

Defendants then offered and introduced in evidence a judgment and execution in favor of Henry Bond, against Martha Ann Parkhill, administratrix of the estate of Samuel Parkhill, to wit :

At a Superior Court for the County of Leon, continued and held at the Court House in the City of Tallahassee, on Thursday, the 5th day of May, A. D., 1842. Present, the Honorable SAMUEL J. DOUGLAS, Judge.

Henry Bond, plaintiff,
*vs.*
Martha Ann Parkhill, administratrix of S. Parkhill, deceased, defendant.

} In assumpsit.

This day came the plaintiff by his attorney, and the defendant being solemnly called came not : therefore it is considered by the

Court, that the plaintiff recover against the defendant the sum of twelve thousand four hundred and forty-six and 14-100 dollars, the damages which the plaintiff has sustained by occasion of the defendant's intestate's non-performance of the promises and assumptions in the declaration mentioned, to be levied of the lands and tenements, goods and chattels of Samuel Parkhill, deceased, in the hands of the defendant to be administered, and his costs by him about his suit in this behalf expended, and the said defendant in mercy, &c.

[ *Copy fi. fa.* ]

THE TERRITORY OF FLORIDA.

*To all and singular the Marshals of said Territory—Greeting:*

We command you, as oftentimes before we have commanded, that of the goods and chattels, slaves, lands and tenements of Samuel Parkhill, deceased, in the hands of Martha Ann Parkhill, administratrix, to be administered, you cause to be made the sum of twelve thousand four hundred and forty-six dollars and fourteen cents, which Henry Bond lately, on the 5th day of May, 1842, recovered in our Superior Court for the County of Leon, in the Middle District, as well for his damages which he hath sustained by the occasion of the non-performance of certain promises and assumptions by the said Samuel Parkhill in his life time to the said Henry Bond lately made, and likewise the sum of ———— ————, which to the said Henry Bond in the same court adjudged, for his costs by him in that behalf expended, together with lawful interest on said damages, from the rendition of said judgment until paid, and the costs of this writ and of your proceedings hereon; and that you have the said sums of money before the judge of our said court, at Tallahassee, within 120 days from date, to render the said H. Bond the sums aforesaid, and have then and there this writ. Witness Richard T. Birchett, clerk of our said court at Tallahassee aforesaid, this 28th day of October, A. D., 1843, and of the independence of the United States the sixty-eighth year.

[SEAL.]            R. T. BIRCHETT, *Clerk.*

[*Endorsed.*]

MEM.—This execution is entitled to a credit of seven thousand four hundred and ninety-two 46-100 dollars, as appears by the return on the *alias fi. fa.* returned to this office.

Test:          R. T. B., *Clerk.*

By virtue of this execution, I have this day, 30th October, 1843,

levied on one hundred and two negro slaves, the property of defendant, a schedule of which is attached to execution No. 2,115.

J. G. CAMP, <em>Marshal.</em>

By A. A. FISHER, <em>Deputy Marshal.</em>

Defendants also called James E. Broome, Judge of Probate, who, being duly sworn, deposed that the commissions due defendant, Moseley, on the account of his administration, excluding the 184 slaves sold by John G. Camp was $377 76—if those slaves are to be considered as administered upon, then he will be entitled to commissions to the sum of $3,799 74. If all the property contained in the inventories is to be considered as chargeable for commissions, then the sum will be assessed at $4,807 26.

Defendant's counsel then asked the plaintiff's counsel for an admission that the one hundred and eighty-four slaves sold by Camp were included in the inventories and appraisements exhibited, and also in the stock mortgages heretofore introduced—to which, with the additional fact that the defendants herein are now suing the purchasers for the same slaves, is assented to by both parties, and these facts to be considered as proved.

Defendant's counsel then moved to introduce the vouchers rejected by the Judge of Probate, viz : two receipts for payments made to Mrs. Martha Ann Manly, on account of her dower interest, and on account of James T. Archer, and to have allowance therefor, to wit :

Received, Tallahassee, 27th March, 1846, of W. D. Moseley, administrator *de bonis non* on the estate of Samuel Parkhill, deceased, five hundred and sixty 24-100 dollars, on account of my wife's dower in said estate for the year 1845.          H. MANLY.

$560 24-100.

Received of W. D. Moseley, administrator *de bonis non* of the estate of Samuel Parkhill, the following notes in part payment of my wife's dower out of said estate, to wit : Edward Houston, R. A. Shine, J. S. Bond's note for $352, with a credit by J. G. Gamble, of $129 ; L. H. Branch, Joseph Branch and E. Bradford's note for $80, credit by 9 90-100 dollars ; Thomas Lang, John Hardin and W. S. Murray's note for $64, credited with $8 ; R. A. Shine, Edward Houston, and J. B. Bull's note for $176 ; R. W. Alston, Minor Walker and Thomas Gordon's note for 144 dollars, credited with 94 50-100 dollars ; H. Bond, J. W. Argyle and W. F. Lloyd's note for $64 ; T. A. Bradford, E. Bradford and L. H. Branch's note for $20.

H. MANLY.

Received of William D. Moseley, administrator *de bonis non* of the estate of Samuel Parkhill, the sum of fifty one dollars on account of moneys paid by me to the Clerk of Leon Circuit Court for expenses and costs on appeals taken by the administrators to the Supreme Court of the State, 28th February, A. D. 1846.

JAMES T. ARCHER.

To the introduction and allowance of the payments made to Mrs. Manly, widow of said Parkhill, the plaintiff, by its counsel, objected, because her allowance or share in the personal estate of said Samuel Parkhill had not been allotted and set apart to her as provided by law, but the Court overruled the objection, and allowed the receipts to be read in evidence to the jury : to which the plaintiff, by its counsel, excepted.

Defendant's counsel then moved to introduce evidence under the said issue of *plene administravit* of the liability of defendants for counsel fees and expenses of the administration on the ground of a right of retainer to that extent, to the admission of which evidence the plaintiff, by its counsel, objected : but the Court overruled the objection and ordered the evidence to be admitted ; to which decision the plaintiff excepted.

And thereupon, under said decision, the defendants introduced Medicus A. Long, who being duly sworn deposed, says he is aware of the services rendered the administrators by their counsel, in the following suits, to wit: The foreclosure suit brought by the bank against Mrs. Manly and her husband ; was present at the trials in the Superior and Supreme Courts. He also knows of the detinue suits now pending brought by the administrators of Parkhill, said to be some twenty in number, for all which and other services he thinks the sum of three thousand or thirty-five hundred dollars, including the present suit, a reasonable charge.

Also Simon Towle, a witness duly sworn in this behalf, who deposed that certain suits for slaves had been brought in Louisiana, fifteen slaves in number, there were two purchasers of these slaves. Defendants are liable for costs of suit there, if they fail, and also for counsel fees ; no sum of the latter has been agreed upon, would probably be some three or four hundred dollars if unsuccessful—if successful, it may amount to seven or eight hundred dollars.

Also John B. Keen, who deposed that the Clerk's office of the Circuit Court had claims for fees against defendants as administrators—two hundred dollars would cover the amount.

JANUARY TERM, 1849.                    689

Union Bank *vs*. Parkhill's Admr's—cross writs of error.—Statement of Case.

Also recalled Judge Broome, who deposed that the defendants as administrators of Parkhill, were indebted to his office from two hundred to two hundred and twenty dollars; it is for fees in the audit of accounts.

And here the defendants rested their cause.

Plaintiff, by its counsel, then introduced the mandate of the Supreme Court reversing the judgment of the Union Bank of Florida, against Manly and wife, administrators of S. Parkhill, to wit:

### State of Florida.

*To the Honorable the Judge of the Circuit Court of the Middle Circuit of Florida in and for Leon County*—Greeting.

Whereas, lately in the Superior Court of the Middle District of Florida in and for the County of Leon, before you in a cause between the Union Bank of Florida, plaintiff, and Martha Ann Manly and Hiram Manly in right of his wife, said Martha, administrators of Samuel Parkhill, deceased, defendants, the judgment of said Superior Court was in the following words, to wit: This day came the parties, by their attorneys, and the plaintiff, by its attorney, filed its special demurrer to the defendant's rejoinder to the plaintiff's replication filed herein to the defendant's amended plea *puis darrien* continuance filed by leave of the Court on the 24th February last, in which demurrer the defendant's joined: Whereupon the matters of law arising upon the plaintiff's demurrer to the said rejoinder being argued, it seems to the Court here, that the said rejoinder and the matters and things therein alleged, are not sufficient in law to bar or preclude the plaintiff from having and maintaining its action aforesaid against the defendants. Therefore it is considered by the Court, that the said plaintiff recover against the said defendant, the sum of $94,182 22-100 parcel of the debt in the declaration mentioned and the sum of $27,982 65-100 its damages, making together the sum of one hundred and twenty two thousand one hundred and sixty four dollars and eighty seven cents, and its costs by it about its suit in this behalf expended, to be levied of the goods and chattels, slaves, lands, and tenements, of the said intestate Samuel Parkhill, deceased, in the hands of the defendants to be administered, and the said defendant in mercy, &c., as by inspection of the transcript of the record of the said Superior Court which was brought into the Supreme Court of the State of Florida, by virtue of a writ of error, agreeably to the act of the Legislative Council of the Territory of Florida, con-

tinued in force in this State by the Constitution of this State in such case made and provided, fully and at large appears : And whereas, at the January term, in the year of our Lord one thousand eight hundred and forty-six, the said cause came on to be heard before the said Supreme Court on the said transcript of the record, and was argued by counsel; on consideration whereof it was considered by said Supreme Court, that the said judgment of the Superior Court for Leon County, be reversed, annulled, and set aside, and that the plaintiffs in error recover against the said Union Bank of Florida, the defendant in error, their costs by them about this suit in this behalf' expended, which costs amount to the sum of $25,89-100.

You therefore, are hereby commanded, that such proceedings be had in said cause as according to right and justice and the laws of the State of Florida, ought to be had, the said writ of error notwithstanding. Witness the Honorable Thomas Douglas, Chief Justice of said Supreme Court, at Tallahassee, this fourth day of May, A. D. 1846.

[Seal.]                                   M. D. PAPY,
                                     Clerk Supreme Court.

Also the judgment of the Circuit Court and dismissal of suit therein, to wit : At a Circuit Court for the County of Leon, continued and held at the Court House in the City of Tallahassee, on Saturday the 9th day of May, A. D. 1846 : Present the Honorable George W. Macrae, Judge, &c.

The Union Bank of Florida, plaintiff,

*vs.*

Martha Ann Manly, and Hiram Manly, in right of his wife, said Martha, administrators of Samuel Parkhill, deceased, defendants.
} In debt.

This day came the defendants by their attorney, and presented to the Court here, the mandate of the Supreme Court of this State, to which an appeal had been taken by the defendants from a judgment heretofore rendered in this cause, by which mandate it appears that the judgment heretofore rendered in this cause was reversed, annulled and set aside, and that the cause be ordered to be remanded to the Circuit Court for Leon County, with directions to that Court that such proceedings be had in said cause, as according to right and justice and to the laws of Florida ought to be had. It is, therefore, ordered that the judgment heretofore rendered in this cause in the Su-

JANUARY TERM, 1849. 691

Union Bank *vs.* Parkhill's Admr's—cross writs of error—Statement of Case.

perior Court for the county of Leon be annulled and set aside, and that the said defendants, as administrators as aforesaid, recover against the said Union Bank of Florida their costs by them about their defence in this behalf expended, as well in the said Supreme Court, as in the said Superior and Circuit Courts, to be taxed by the clerk of this Court.

The said plaintiff offered in evidence sixty-nine bonds of the Territory of Florida, issued and negotiated by the Union Bank of Florida, under its act or charter of incorporation, amounting to the sum of sixty-nine thousand dollars, being the amount for which the slaves of Samuel Parkhill, in the said nine stock mortgages, were held and bound ; for the purpose of showing that the plaintiff had, by taking up the said bonds of the territory, relieved the property from any lien, real or pretended, of the said Territory of Florida upon the mortgages in question, or so much of the property specified and conveyed therein. The plaintiff admitting that the security on all lands and negroes in the mortgage mentioned was *in solido*, and attached to all and every part of the same, and that the bonds offered were not the property of the bank, but held in trust by it for a creditor of the bank. But the Court refused to allow said evidence to go the jury—to which refusal, the plaintiff by its counsel excepts.

This being all the evidence introduced, and the cause having been fully argued to the jury, the said plaintiff by its counsel prayed the Court to instruct the jury—

That the Union Bank, for itself, and as trustee, a depository of the territory, and for the security of the territory itself, hath, by virtue of the stock mortgages offered in evidence in this case, and of the act of incorporation of the Union Bank, and the acts amendatory thereto, a lien on the mortgaged property covered by the stock mortgages of Samuel Parkhill, not only for the nominal amount of the mortgages for stock, but also for the amount of the stock note or loan of two-thirds, made to the stockholder, Parkhill, on pledge of stock, and which is sued upon in this action, with interest on such stock loan, and, therefore, the property contained in the inventory, and included in the said stock mortgages, are assets in the hands of defendant, Moseley, applicable to the discharge of the plaintiff's debt demanded in this action.

Which instruction the Court refused to give, and the Court instructed the jury as follows, to wit :

38

692 SUPREME COURT.

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Statement of Case.

1. That the capital of the Union Bank of Florida was raised through means of the territorial bonds—that these, though in form the obligation of the Territorial Government, were in effect and actually bonds of the stockholders, the obligation by the Territorial Government being assumed as a means to effect their negotiation in the foreign market.

2. That the said bond and mortgage, executed to the bank by the stockholder, are, by the 8th section of the charter, intended to secure payment of the principal and interest of the bonds issued by the territory, and are in contemplation of law as if both bond and mortgage had been originally made and executed to the capitalist, or holder of the territorial bonds, by the stockholder. That so soon as the money was raised by sale of the bonds, the stockholder became debtor, and the bondholder, or capitalist, the creditor, the debt being secured primarily by the bond and mortgage of the stockholder, and again by the endorsement of the bank, and by the engagement of the territory.

3. That the bond and mortgage of the stockholder being payable to the bank, constituted the bank as agent and trustee to see principal and interest paid agreeably to the terms of the bond and mortgage. That so soon as the bank received the money, through the sale of the bonds at par, *eo instanti* the shares of stock were paid in full.

4. That the bank cannot, through a judgment and execution in its favor, divert the mortgaged property from the purposes and objects designed by the mortgage and the charter of the bank, and that a sale thereunder is in violation of its trust and illegal.

5. That the debt on which the present suit is founded is for a loan, and though secured, like every other debt of a stockholder, by his shares, is not secured, either directly or indirectly, by the mortgage of the stockholder.

6. That an assignment of the bond and mortgage of the stockholder by the bank, in payment of territorial bonds, will entitle the assignee to coerce payment, through a sale of the property, on the terms prescribed by the mortgage, and that the bank itself may enforce sale thereof in such manner and for such purpose, but that said property may not, except by consent of all parties interested, be sold by the said bank in any other manner.

To all which said several decisions, rulings, judgments, instruc-

JANUARY TERM, 1849. 693

Union Bank *vs*. Parkhill's Adm'rs—cross writs of error.—Statement of Case.

tions and refusals to instruct the jury, as prayed for by plaintiff, the said plaintiff by its counsel excepts ; and forasmuch as the said several decisions, rulings, judgments, instructions and refusals to instruct, do not appear of record, the said plaintiff by its counsel tenders this his bill of exceptions, and prays that the same may be signed, sealed and made part of the record, and it is done accordingly.

[SEAL.] THOMAS BALTZELL, *Judge.*

The defendants by their attorneys also excepted to various rulings of the Court, which exceptions were noted in the following bill of exceptions filed by defendants :

On the trial of this cause, the evidence was offered and admitted or refused, and other proceedings had, in all respects as set forth in plaintiff's bill of exceptions, to which bill of exceptions reference is here made by consent, to avoid useless repetition.

Upon which state of facts and the pleadings, the Court gave the following instructions, to which the defendants by counsel excepted, save the second :

1. That it is competent for a person obtaining a loan (on stock) to pay the interest in advance at the time of the loan, and such an arrangement freely and fairly made is not condemned or prohibited by the laws of usury, or by the charter of the bank.

2. That the stockholder under the 29th section was entitled to a loan equal to two-thirds the amount of his shares—in other words, was entitled to the entire sum, without a deduction of interest, at the time of the loan.

3. That it was competent for the stockholder, however, to waive his privilege of taking the entire two-thirds, and pay the interest in advance, as provided under the 28th section, and that such an arrangement is not illegal.

4. That if the jury are of opinion that such an arrangment was made with the mutual consent and approbation of the officers of the bank and the stockholders, and became a custom and usage of the bank, thereby asserting and fixing such a construction that defendants are precluded by it, and cannot now complain of it.

5. There being no pretence that more than ten per cent. interest was taken under this contract, or that there was any corrupt or wilful design to take more than the amount allowed by the charter, there is no forfeiture of the interest, as provided by the law of usury, or of the principal and interest, as contended by the defendants.

694      SUPREME COURT.

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Statement of Case.

6. That the taking interest in advance on the note sued on, except in pursuance of such wilful and corrupt design, was not illegal, and' was not improper in this case.

11. That there was no disposition or sale of the stock by the bank, as provided by the charter, and defendant is not entitled to a set off therefor.

12. That if there was neglect of duty in making a sale as provided, it was matter for suit, and to be compensated in damages, and not the subject of set off or payment.'

13. That the sale of shares by the bank was a cumulative remedy, and that it might elect either a suit on the note, or sell after forfeiture, and until satisfaction by one of the means, the note was not extinguished.

14. If the jury are of opinion that the arrangement of reserving interest in advance on the stock note, was not with assent and free accord of said Parkhill, but coerced from him by the bank, and submitted to as the only means of securing his rights under the charter, then the arrangement was illegal, so far as the exaction of interest was received in advance.

Defendants by counsel then moved the Court to instruct the jury, as follows :

1. That plaintiff had not power in loans under the 29th section of its charter, being stock loans to stockholders, to deduct interest in advance, or discount bonds or notes ; which was refused by the Court.

2. That plaintiff had no power by its whole charter, and the general law of the land in force, pending the whole of its stock loan transactions with defendant's intestate, to take more than at the rate of eight per centum per annum interest in any case or in any manner, whether taken in advance, or paid subsequently ; which was refused by the Court.

3. That interest on loans under the 29th section of the charter, could only be required to be annually paid up ; which was granted.

4. That in calculating the interest due annually upon the stock loan of each stockholder, it was lawful only to calculate interest by the year, or proportions of a year ; and if the jury believe from the evidence that at any time, at any of said stock loans or renewals for any number of days, or in discounting for days of grace, that interest was calculated by reckoning a day as the 360th part of a year, and

interest was so taken or deducted in the loan or transaction, that such calculation and taking or deducting was illegal ; which was refused by the Court, who gave in lieu thereof, " that in such case the excess of interest was illegal, and should be deducted."

5. That if the Jury believe from the evidence, that the bank, by taking interest in advance, upon any of the original stock loans which have resulted in and been consolidated in the paper now in suit, or by calculating a year at 360 days, took more than the rate of eight per centum per annum interest, that the plaintiff had no right by charter so to do, and cannot recover in this action ; which was refused.

6. That the plaintiff's charter, is an enabling charter, and only gives power to do that which is expressly granted or necessarily implied in the granted powers.    That plaintiff can do nothing which is prohibited, so as to give itself any right thereby ; and that in all things done or attempted to be done by the plaintiff, which are prohibited by the charter, or power to do which is withheld or not given, either expressly or by necessary implication, such acts or attempts are without law or authority, and as to them there is no charter or corporation, and out of such acts or attempts no contract or cause of action can arise, and as to the same there is no party on the side of the corporation, capable of contracting or of bringing an action for violation of contract, and no suit can be instituted or recovery had, on any such act or attempt beyond the law of its existence and nature.    And that there is no express grant and no necessarily implied power to take interest in advance upon stock loans, or in any wise or mode on such loans, to take more than at the rate of eight per centum per annum interest in the charter of the plaintiff; and on the contrary the taking of more than the rate of eight per cent. per annum is expressly prohibited.

Which was refused by the Court.

7. That though by the general law in force pending these transactions, natural persons might take more than the rate of eight per cent. per annum, by expressing the same in the contract, yet in this case there is no evidence of any express agreement to give or take more than eight per cent. per annum, yet the bank being entirely a creature of legislation, and expressly prohibited, could not take in any case, more than at the rate of eight per centum interest, and any attempt so to do could create no contract.

8. That any contract by the bank under the 29th section, taking

696    SUPREME COURT.

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Statement of Case.

or reserving more than at the rate of eight per centum per annum, is usurious, and by the charter, each stockholder is entitled to a credit or loan fully equal to two-thirds the amount of his shares, and Parkhill's administrators are entitled to have a credit for all monies paid or withheld upon pretence of interest in advance, or beyond the rate of eight per centum per annum, together with interest on the same at the rate of eight per cent. from the time of such payment or withholding, and the same may be allowed either by way of recoupment under the plea of judgment or money had and received in the plea of set-off; which was refused by the Court.

9. That by the 29th section of the charter, Parkhill, and his representatives after his death, were entitled to a loan equal to two-thirds the amount of his shares, to continue pending the existence of the the bank, subject only to the proviso, that the note or obligation should be annually renewed, and the interest paid up : That this proviso does not make a condition precedent or subsequent to defeat the loan and render the same payable or recoverable by action thereon, upon the stock obligation, but is simply directory to the officers of the bank and the stockholder, and further operates as an agreement or covenant to pay interest by the stockholder annually, and in default thereof gives a right of action for such interest only or to sell stock.

Which was refused by the Court.

10. The 9th being refused, counsel further prayed the Court to instruct the jury—That if the proviso is to be considered as a condition, it could only be a condition subsequent to defeat the continuance of the loan, and if so, there were two conditions required, 1st—giving a note or obligation annually, 2d—paying up interest annually, and that the continuance of the loan could not in this case be defeated by failure to give an obligation annually, because that is rendered impossible by the act of God, in the death of Samuel Parkhill, and act of law, which renders his representatives incapable of giving a new obligation of a character to bind the estate, or constitute a proper legal renewal of Parkhill's obligation.   And that if the jury believe that at any time more than the rate of eight per cent. per annum has been intentionally taken by the bank upon this loan, or any part of it, embraced in the note in suit, then all interest is void and irrecoverable, and all obligation to pay interest by Parkhill or his representatives is done away with, by the act of the other party, and so there is in the case supposed no condition broken in this case to the contin-

uance of the loan, and it cannot now be recovered ; which was refused by the Court.

11. That, if there has been a valid sale of Parkhill's stock, his representatives would in this action be entitled to recover its value as sold—and if there has been no valid sale, and Parkhill's representatives are still the owners of the stock, the bank cannot recover in this action upon the stock note, because the administrators could not renew the note, and upon payment of interest would be entitled to keep the loan—and to give a judgment for the principal would be to give judgment against them to recover that which they have a right to keep, the interest only being due to the bank ; which was refused by the Court.

12. That, by the second section of the amended charter, March 1, 1839, it became the duty of the bank to sell, on ten days' notice, the shares of any stockholder, which became forfeited under the first section of that act, and that the bank must show a compliance with this duty and the amount of sale, before it can sue on the stock note, and that the amount of such sale (except the premium) must be credited to the owner of the stock ; which was refused by the Court.

13. That the bank, after lawfully declaring Parkhill's stock forfeited, and advertising and selling to the highest bidder, (if the jury believe such was the fact,) diverted all interest of Parkhill or his representatives at the moment of such sale, and they were in no manner responsible for the conduct of such purchaser, and could not, either by his failure or compliance with the charter, become re-invested, without their own express consent, with the ownership of said stock, or responsible for any conduct of the purchaser, or bound to enquire into the same, but had a right to treat the said sale as legal, and to insist upon all legal consequences therefrom arising ; which was refused by the Court.

14. That, upon forfeiture, the bank was bound to sell, on ten days' notice, and if it failed so to do, was responsible in this action for the highest rate at which sales had been made, or at least the par value of the stock, unless they proved it to be then worth less than par ; which was refused by the Court.

15. That the restriction in the 28th section of the charter to the bank, not to exceed the rate of eight per cent. per annum, is the " *expression*" of the rate of interest which the bank could not exceed, when no other rate is mentioned, and as a part of every con-

tract (as a limit) the bank might make—and if it is not such an expression in this case, then no rate of interest is expressed, and the rate of eight per cent. could not be exceeded by the general interest law then in force ; and if the jury believe this has been exceeded intionally, (not by miscalculation or mistake,) then the defendants are entitled to recover all the interest paid since such excess was first taken ; which was refused by the Court.

To which refusals, the defendants by counsel excepted, and prayed that this their bill of exceptions might be signed and sealed by the Court, and made a part of the record, which is done accordingly.

[SEAL.]                     THOMAS BALTZELL, Judge.

The plaintiff prosecuted a writ of error in this Court, to reverse the judgment rendered in the Circuit Court, and assigned errors in conformity with the exceptions taken in the plaintiff's bill of exceptions.

The defendants also prosecuted a writ of error in this Court to reverse the judgment, and assigned errors in conformity with the exceptions taken by them at the trial, and specified in their bill of exceptions.

The questions arising on the errors assigned by the bank, were first argued.

*Thompson*, in support of the errors assigned.

*Archer*, contra, contended—

That inasmuch as the verdict and judgment were in favor of the plaintiff (the bank), except as to the question of assets in the hands of the defendants, the only error assignable by the plaintiff is, that upon the pleadings and proofs in this case, the judgment should have been rendered for assets in hand, and not for assets *quando acciderint*. That all the other points raised in argument upon this assignment of errors, are irrelevant, and therefore, require no response.

2. That the lands and slaves mortgaged by Samuel Parkhill to secure his subscriptions for stock in the Union Bank, were by the charter secured to the possession of the stockholder, (Samuel Parkhill,) until the maturity of the mortgages, to be held as a fund to redeem the outstanding obligations of the Territory issued to accommodate the bank, and upon faith and pledge of these mortgages, and the property therein contained—That to allow these slaves and lands to be sold by the bank under judgment and execution based upon the stock note or any accommodation paper, would be a diversion of this fund and a destruction of the indemnity secured to the Territory of Flori-.

da—That therefore these lands and slaves, if in the possession of the defendants, are not assets in their hands liable for the payment of the stock note.

3. That the shares of stock pledged for the payment of the stock note cannot be construed to embrace the lands and slaves mortgaged by the stockholder to secure the ultimate payment of his subscriptions to the bank—That upon failure of the stockholder to pay his annual interest on the stock note, the charter contemplated a sale of his *shares* of stock, not of his *lands and slaves*—That according to the testimony, such sale of the *shares* was made in this case, and a premium bid for the stock.

4. That the amendment of the charter, (1839,) on which the plaintiff mainly relies to establish that the property mortgaged for subscriptions of stock, is liable to sale under judgment on the stock note, is not obligatory upon the stockholders—That the original charter is a contract, and contains no provision for its amendment or alteration, and cannot be amended or altered by the Legislature, except by the unanimous consent of the stockholders—That unless there be authority in the *original charter* for amendments, no subsequent amendment can bind any stockholder who rejects the amendment; and if any reject it, it cannot bind the others, for it cannot be the law of the corporation unless it binds all.

5. That the deposit of sixty nine Territorial Bonds in the registry of the Court calling for $69,000, does not relieve the incumbrance upon these lands or slaves, created by the stock mortgagés.—It is admitted that the lands and slaves are thus mortgaged *in solido* for about double that sum—if these incumbrances can be relieved in this mode so as to make the property subject to execution, based upon the stock note—Territorial Bonds to the whole amount should have been deposited.

6. That upon the proofs in this case, the finding of the jury as to the question of assets, was correct, and that by reason of any thing in the plaintiff's exceptions, the judgment ought not to be reversed.

*Randall,* for the Bank, in reply:

The object and purpose of the creation of this corporation were to promote certain ends, deemed beneficial to the public, viz:

I. The introduction of foreign capital into the country, and as consequences to result—

700     SUPREME COURT.

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Arg'nt of Counsel.

1. Greater extension and facilities to business.

2. Diminution of the rate of interest.

3. Increased facility to the State, of the power of taxation. These benefits were realized to the extent anticipated.

II. The "*bonus*" secured to the State by the 23d section of the charter. This last benefit, it is admitted, has not been realized—nevertheless, its promise was a part consideration to the territory for the franchise granted.

Principles of law applicable to this and other corporations. "It possesses only those properties which the charter of its creation confers upon it, either expressly, *or as incidental to its very existence.* These are such as are supposed best calculated to effect the object for which it was created." Opinion of Ch. J. Marshall, in Dartmouth College *v.* Woodward, 4 Con. R., 544.

These objects "are such universally as the government wishes to promote. They are deemed beneficial to the country, and this benefit constitutes the consideration for the grant." Ibid.

Distinctive character of this bank, as compared with ordinary banks of discount and deposit—

First and great distinction. The stockholders paid in no money, on account of their subscription for stock. The capital of the bank was borrowed on faith bonds of the Territory of Florida, payable to and endorsed by the bank, on the sale of which the fund was raised. Bonds and mortgages by the stockholders on their lands and slaves were made payable to the bank, to cover the amounts of their subscription, and to an amount equal to that for which the territory issued its bonds. See 1st and 10th sections of Charter, Thompson's Digest, 284, 287.

By 11th section of the charter, Thomp. D., 288, the *bank*, and not the territory, was primarily to pay—although by the terms of the bond, the territory was *absolutely bound to the bondholders.* See 13th and 14th sections of Charter.

Second. Another provision distinguishing this Union Bank was, that the stockholders, on the faith of their subscription thus secured, were entitled to a loan of two-thirds of their stock shares. 29th section of Charter.

From a review of the whole charter, it results—

I. That, though the faith of the State was pledged to raise the capital of the bank, yet the *loan*, which brought this capital into the

vaults of the bank, was negotiated and made by the bank, and its proceeds to be subject to the management of the bank, under the terms of its charter, and as resulting *negatively.*

II. The loan was not made to the State, nor to the stockholders of the bank *individually,* but to the corporation aggregate, the bank alone. See 1st, 10th, and 11th sections of Charter.

III. That all mortgage securities taken by the bank, under terms of its charter, and contracts made in pursuance thereof, *belong to the bank exclusively, in every legal sense.*

  1. Such pledges were taken to the bank alone.

2. They were to remain in custody and possession of the bank, by 9th section of charter.

3. By same 9th section, the bank could transfer, release and discharge them, substituting others—releasing old stockholders and their property, and receiving new ones.

Thus, then, the bank had full control of these securities, with no power reserved to the State to direct its action. If there was any equity in the State to control or interfere with the subject, it was a latent equity, to be called into action by a suitable remedy, and not to be collaterally invoked by third parties.

If the bank was a trustee, it was a trustee coupled with an interest and free to act, unless controlled by a court of equity acting directly on the subject, and at the instance of proper parties.

But if it were possible that the mortgagors had any thing to do with the application of the trust fund, (if trust fund it is to be considered,) then finally we reply, *that payment, or tender to pay,* must precede the application.

Let the present defendants make payment, and its application will go, as they contend it should go, to the bondholders of the bank, and to the release and indemnity of the State.

The exhibition in court in this case of sixty-nine bonds, adequate to cover all the mortgaged property, and their tender in release of and indemnity to the State, prove this intended application.

The case before the Court exhibits beyond question, that defendant's intestate was largely indebted to the bank on his stock loan, and for arrears of interest for many years—with an enormous floating debt, and only partially secured, on accommodation paper.

How is this large debt to be collected ? By the forfeiture and sale of his shares of stock—say defendants—the only remedy secured to the bank, according to their agreement.

But the facts of this case, and the whole history of the bank, prove that this is no remedy at all. The shares now and for years, have been nothing worth—cannot be sold, on the terms of the charter. They could only be sold on the condition of a new stockholder substituting other mortgaged property of equal value in place of the retiring stockholder. None such can now be met with—for it would be incurring a burden, a liability, with no prospect of advantage or safety. Even the loan of two-thirds of the amount of stock could not now be secured to the new stockholder, if he was willing to take it—for that yet remains with the defaulting stockholder, not collected, and not collectible, *say defendants*, until the expiration of the charter.

We say that the forfeiture and sale of the " *shares*," provided for in the 29th section of the old charter, and by the amendment of 1839, necessarily involves and carries with it the forfeiture of the property, real and personal, mortgaged to secure these shares.

This amendment of 1839 is said not to be valid or binding, although accepted by a large majority of the corporation, at general meeting of the stockholders. On principle and authority we affirm the contrary. The powers previously imparted to the company made it a legal being, an entity and a unit—acting not through the agency of its individual corporators, but in its aggregate and corporate capacity.

Its consent then to the amendment being expressed in the mode pointed out in the charter, binds and concludes as well those assenting to, as those dissenting from, the amendment.

Samuel Parkhill, defendant's intestate, in his life time voted with the majority to accept this amendment. Angel & Ames on Corp. p. 280, and cases cited. Withsul v. Gaither, 6 T. R. 388. Ex parte Rogers, 7 Cowen, 530, note.

And now the main question which I have to discuss, properly arises, and that is :

*Whether on failure of any stockholder, to renew his note or bond for his stock loan, and to pay the interest due thereon—and after a judgment at law upon said bond or note, it is competent for the bank to subject the mortgaged premises to execution in satisfaction thereof ?*

I. We hold that such a resort is indispensable to preserve the very existence of the bank, to enable it to observe its faith and obligations to the State, to its bondholders and general creditors. It is only necessary to sustain the negative of this proposition, in the present

case, and in two or three more even of less magnitude, to wind up and close the institution in bankruptcy and ruin.

The very end and object of its creation would be defeated by such a principle of construction. For unless the bank can collect its debts, it is obvious it cannot discharge its liabilities. Invoking here the principles announced by the Supreme Court of the United States in the Dartmouth College case—quoted in the outset—as applicable to the construction of charters,

2. We proceed to the special facts and law of this case.

The bond in suit is for a loan obtained by defendant, Parkhill, in his life time, under the 29th section of the charter—and " on a pledge of his shares of stock." And now what does this *pledge* mean?

In ordinary banks, a pledge and forfeiture and sale of " shares of stock," when those shares represented money paid, would insure a full satisfaction of the debt.

In the Union Bank, unless the term " shares of stock," carry with it and involve also " the property pledged" to secure those shares, the forfeiture and sale of the shares simply and alone, as was attempted in this case, secure to the bank *no return whatever*.

That surely was not the design of the charter. By the 29th section, the stockholder can only obtain a loan by giving and renewing his notes, &c., " *for the repayment of the money annually and having paid the interest up.*"

If he do not pay the interest up, he cannot renew his note or bond. At maturity if not renewed, is it not due and payable—principal as well as interest? How can this result be avoided? But on the other side, it is said the loan is permanent to the end of the charter.

Now this we deny—and we challenge the production of a line or word in the charter which can sustain such an assertion.

The 29th section speaks no such language—imports no such privilege.

The *loan* is not to exceed one year. It is then limited. It is to be made upon condition precedent of renewing note and paying up interest.

It is then not *absolute*—the right—but *conditional*. Being then a loan for one year, when past due and not renewed or paid, what is to become of it? May it not be sued for and recovered? So the Court below decided and gave us a judgment. But how is it to be satisfied?

It is in evidence in this cause, that except the property mortgaged to this bank, Parkhill's estate has none other, is utterly insolvent.

Why then may not the plaintiff, the judgment creditor, holding this very property mortgaged to secure this very debt, apply it to its satisfaction?

We know of no principle of law or equity without the charter, to prevent it.

If its right to do so, be kept in abeyance, be suspended to the end of the charter, its final resort will be utterly valueless.

And now looking to the terms of the charter in this connection, and particularly of the 9th section, we confidently assert :

1. That at their creation "the shares of stock" and "the mortgaged property," which secured them, were intimately blended, and formed one subject of property, were in fact convertible terms.

2. That when *loaned* on the terms and conditions of that section, by the substitution of money—of *cash* for property—the loan contracted on the faith of this subject, attached not to the "shares" alone, but to the "property." The words "such loans as may have been made on the faith of it," refer for their antecedent to the word "property" in the line above—the word "property" is the only antecedent.

This 9th section preceding the other sections which bear upon this point, furnishes the cardinal rule of construction to them all, and to be made sensible, they must be made consistent therewith.

Now refer to the 22d section and it will be seen that to secure any remedy for the debt of the retiring stockholder, this same identity of "shares" and "property mortgaged," must be maintained ; we see by that section that while the shares pass to the new stockholder, the *lien* for the *debt* attaches to the property pledged by the old or retiring stockholder.

See next the 26th section and note the terms "mortgages for loans" as there used. They are said to be "for loans given by virtue of this act." Then the "mortgage" is by the very terms of the act, to secure the "loan" as well as the "stock note or bond."

How utterly does this reading repudiate the notion on the other side, that the mortgage was given only to secure the latter, the stock bond or note—while the "shares" alone were held to secure the loan.

The 27th section sustains our construction also. "Any individual who shall have obtained from said bank ' a loan,' secured by mortgage," &c. The term "loan" here is generally used, and applies as well to "stock loans" as others.

In answer to the position advanced on the other side, that, until the expiration of the charter, the *interest* only, and not the principal of the loan can be collected by the bank, let the 22d section be again referred to ; and it will be seen that, in cases of default of payment, " the debt," the whole debt, and not mere " interest," is recoverable, and that upon " *failure of payment,*" and not at the end of the charter.

This critical analysis of the charter, then, leads to the same conclusion, that an inquiry into the spirit and object of the institution, and the means essential to its successful operation, if not to its very existence, would conduct us ; and we respectfully suggest to the Court, that convinced, as they must be, of the necessity of the resort to secure payment, for which we contend, the judicial eye of the Court should be directed to the charter, with a view favorable to the construction for which we contend. But we ask for no strained or forced construction, but that their ordinary meaning be given to ordinary terms.

*An objection* has been made to the use by the bank of Rowlett's tables for the computation of interest. A full and satisfactory answer to that objection will be furnished by my associate counsel, Mr. Thompson.

Another objection and ground of defence has been taken to our recovery, on the ground of the practice of the bank in exacting *interest in advance, or by way of discount,* as in this case, on stock loans. That objection, too, will be more fully considered and answered by Mr. Thompson. But I may here briefly state, that the only section in the charter which regulates the rate of interest, the 28th section, gives the power to the bank of deducting the interest in advance, both upon " *loans* and *discounts.*"

Moreover the uniform practice from the beginning of the bank— the acquiescence of all parties, and the fact that it was adopted in good faith, being a provision against the interest of stockholders, and in favor of the territory and creditors of the bank—make it a matter of public policy to sustain the usage, if possible. Nay, to allow one of the corporators to escape from his debt on this ground, would be to offer him a premium for his own error or misconduct, and at the expense of honest creditors.

This cause was further argued on the questions arising upon the errors assigned by the defendants.

*Brockenbrough*, for the administrators :

1. To prove the plaintiff's case, it must show *a grant.*

The corporation is extinct. This bank was incorporated by the act of the Governor and Legislative Council of the Territory of Florida, on the 13th February, 1833—amended on the 14th February, 1835—again in 1836, and March 1, 1839.

By the 15th section of the act, 1833, it is created a body politic and corporate, for and during the term of *forty years* from the passage of that act.

By act of Congress, 3d of March, 1845, Florida was declared to be a State of the United States of America, and thereby admitted into the Union on equal footing with the original *States* "*in all respects whatsoever.*"

The question is, whether the corporation did not perish on the 3d of March, 1845, notwithstanding its forty years' grant? To determine this, we must look to the power of the *grantor.*

The grant was made by the Governor and Legislative Council.— The first act of the establishment of a Territorial Government, March 30, 1822—3 Story's Laws, 1828—invests the power of legislation over all rightful subjects of legislation—not violating the laws or constitution of the United States, or the right to religious freedom—in a Governor and thirteen discreet persons, to be appointed annually by the President, by and with the consent of the Senate.

The act of 3d March, 1823—3d Story, 1902—made no alteration in this respect.

The act of May 15th, 1826—3 Story, 2025—only altered this system so far as to make the council elected by the people, instead of the President and Senate ; and all subsequent acts have not changed the investiture of the powers, but only added to the numbers of the council, and erected it into two houses, and in *all*, the unlimited power of repeal is reserved to Congress.

The question will not be made, whether this legislative power could grant a charter to a bank, to be valid during the Territorial Government. But the power to make such a grant, to exceed the territorial life, is denied, as a general proposition, and specially with regard to Florida.

Assuming this power to be as great as the power of Congress over Florida, (and it could not be greater)—let us suppose that this grant had been made by the same charter, directly by act of Congress,

with or without the power of repeal, which was reserved over all acts of the Legislative Council, the act or grant must be held repealed and annulled, by the admission of the State upon an equal footing with the original States—or in other words, the grant of forty years must always have had the implied and necessary limitation going with it, " provided the territory shall so long continue"—because, in addition to the great questions of right and of constitutional law, the whole charter shows that the existence of the territory is incorporated with its own existence in every fibre, and is absolutely necessary to it. The one could not be destroyed without the other. The 25th section, providing for exemption from taxation, manifestly considers the existence of the territory and continuance of the charter as *co-terminous*.

Apart from all reserved and implied power of repeal or implied limitation in the grant, the very act of admission must annul the grant. States cannot be admitted, except on an equal footing with the old States. Congress has power to make all needful rules and regulations respecting the territory and other property belonging to the United States—and conceding that this gives control over all rightful subjects of legislation, it does not follow that *that power and right* extends over a sovereign State, and that sovereign power can be exercised and franchises and privileges granted away; which belong to the people, for a longer time than the power over the Territorial Governments continue. Congress cannot grant such a privilege in the body of a single State, therefore it cannot grant such a privilege in a territory, to continue over after the State becomes sovereign and is admitted. If so, the States would not be on an equal footing. If this franchise could have been validly granted in Florida, to continue now, why might not all the privileges, and franchises and rights of the people have been granted away—and if for forty years, why not forever ? If the hands of the people, or their legislature when sovereign, can be tied by contracts of Congress, made whilst they were in pupilage and had no right to consent, in any one particular, why not in all ?—where is the line of limitation ? They considered these franchises important in the State constitution, and were very strict with the State legislature in regard to them.

In Permoli *v*. First Municipality, 3 Howard, 610, in which it was contended that religious liberty, secured by the ordinance of 1787, extended by Congress to Louisiana, was violated by laws and ordi-

40

nances of the First Municipality of New Orleans, it was held by the Court, that those acts were in no further force than part of the territorial law of Orleans—and so far as they conferred political or civil and religious rights, the laws of Congress were all superseded by the State Constitution, and none of them were in force, only so far as the constitution adopted them as laws of the State.    Can this grant be in force in Florida, then?—or are all acts of Congress only null, which called to aid the political rights of the citizens, but *omnipotent*, when granting away their franchises?

In Pollard's lessee *v.* Hagan, et al., 3 Howard, 228–'9, the Supreme Court United States says : " Alabama is, therefore, entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law to the same extent as Georgia was, &c.    To maintain any other doctrine, is to deny that Alabama has been admitted into the Union on equal footing with the original States, the constitution, laws and compact to the contrary notwithstanding."

In the same case, 223–'4, after showing that Alabama, on her admission, succeeded to all the rights of *sovereignty, jurisdiction* and *eminent domain*, which belonged to Georgia before the cession, and that by agreement the United States retained nothing but the public lands—and that if an express agreement and stipulation had been inserted, granting the municipal right of sovereignty and ˙eminent domain to the United States, such stipulation would have been inoperative and void, because the United States has no authority to take or exercise municipal jurisdiction, sovereignty, or eminent domain within the limits of a State or elsewhere, except when expressly granted by the constitution of the United States, the Court concludes thus : " The right of Alabama and every other new State to exercise all the powers of government which belong to and may be exercised by the original States of the Union, must be admitted and remain unquestioned, except so far as they are temporarily deprived of control over the public lands."    That case decides, in the face of the compact, giving all waste and unappropriated lands to the United States, that the soils and shores of navigable rivers belong to the State, in virtue of its eminent domain and municipal sovereignty.—To whom, then, shall the franchises of the people, which *they* have never conveyed away, belong?

If an express stipulation could not confer upon Congress the power

of municipal legislation, or to grant away the common property of the people within the body of a State, how can it make such a grant without stipulation ?

But independent of any general reasoning upon this subject, applicable to all territories, Congress could not grant away any of the franchises of the people of Florida for a longer term than its own temporary powers of government. It is inhibited by the supreme law of the land, the treaty of 1819, from so doing.

It is true that, by the 2d article of that treaty, His Catholic Majesty cedes the Floridas in full property and sovereignty. But this is, of course, subject to the subsequent stipulations in the treaty, which show that though the property and sovereignty was full, it was *temporary* in its nature, and upon *condition* of its being made a *State as soon as possible,* and in conformity with the principles of the Federal Constitution.

The 6th article, 1 Elliot's Diplomatic Code, 420, (on the Spanish side, which is very different from the English side, but which Spanish side is the correct one, to look to, to see what the United States engaged to do in behalf of the subjects of Spain then transferred, and being the language of the party granting, is to be taken most strongly against the grantor,) stipulates that the inhabitants of the territory which His Catholic. Majesty cedes by the treaty to the United States, " shall be incorporated into the union of the same States *as soon as possible,* according to [or in conformity with ' *legun,*'] the principles of the Federal Constitution, and admitted to the enjoyment of all the *privileges, rights* and *immunities* which the citizens of the other States enjoy." The Spanish side makes admission as soon as possible, and applies the principles of the Federal Constitution to the terms of admission, *not the time,* as in the English side.

This admission as soon as possible in conformity to the principles of that constitution, must mean as that constitution requires, upon an equal footing with original States—and especially when coupled with the subsequent part of the same article, which not only secures admission of the State upon an equal footing, but that the inhabitants each and all shall be admitted to the enjoyment of all the rights, privileges and immunities which the citizens of the other States enjoy.

Can this claim be complied with, if a portion of their rights and

privileges are previously ceded away by Congress, or its agent, the Territorial Government? The other States are privileged—have immunities, which secure them from such grants by Congress—has Florida, if this grant still continues?

But it follows, also, from this article, that the government of Congress was temporary—it never had perpetual power. It in the act of taking, guarantied full State's sovereignty unimpaired to the people of Florida, and the full privileges of the people, as soon as possible. Could they in 1833, fourteen years afterwards, cede away those privileges for forty years? It was a violation of the obligation of contracts, of the treaty with Spain, and the constitution of the United States, if such result was intended. That treaty was supreme law. Florida could not violate it in her constitution—could the Territorial Legislature do more than a sovereign State?

This charter was a grant—a contract executed—all the cases in the Supreme Court have gone upon that position, and because they were *grants,* they have been held inviolable and unsusceptible of repeal. If such was the case, and this grant extended beyond the 3d of March, by virtue of the acts of Congress and the territorial grant, it follows now that it cannot be repealed, or altered, or modified by any power, for its whole term of forty years; for Congress has lost all power of repeal, and the State never has acquired it, if this charter exists by *right paramount to the State Constitution and laws.*

All these franchises, privileges, immunities granted are *property,* and have been held inviolable by a State, when validly granted, because they were *property.* However shadowy may have been the interest of the grantee, though a mere naked trustee, without the slightest beneficiary interest, these franchises have been held to be property, and where valid, contracts irrevocable.

The franchise and privilege in question was one existing in Florida, to be exercised in Florida, it is carved out of the mass of the privileges of the people of Florida and ceded away—whose property, then, was it that was given away?—not the property of the United States, but of the people of Florida. *Their* rights, privileges, and immunities were ceded to certain persons.

It matters not for this argument how omnipotent may have been the powers of Congress, they were but *temporary.* This power to grant was either a part of the sovereign power of the State, with which Congress cannot be invested by treaty with Spain, or other-

wise, or it was not. If it was *not*, then the grant was void now that the State exists, because none but a sovereign power can grant away the privileges of the people and create corporations. If it *was* one of those sovereign powers of the State, it belongs to the State the instant it is formed and in full perfection, and the grants of the temporary government cannot continue a moment, because if they could, then Congress might make such a grant in the body of a State, which is absurd.

If the United States succeeded to all the rights of the King of Spain, that power was but temporary, and could not be exercised beyond the limited time, without violation of the treaty.

But in Pollard's lessee *v*. Hagan, et. al., 3 Howard, 225, it is said " it cannot be admitted that the King of Spain could, by treaty or otherwise, impart to the United States any of his royal prerogatives, and much less can it be admitted that *they* could have *capacity* to receive or power to exercise them." Every nation acquiring territory, by treaty or otherwise, must hold it subject to the constitution and laws of its own government, and not according to those of the government ceding it. See Vattel's Law of Nations. And the Court declared a grant invalid, made by the Union, in Alabama, because the sovereign powers of the King went to that State, and not to the Union.

Suppose this grant for forty years, made on the 2d of March, the day before the admission, it would have been held by all invalid and a fraud upon the right of the State. A person who has an estate for life, or other uncertain interest, may make a grant for years, because it is a lesser estate, but it is only valid during the continuance of the uncertain estate.

If this charter had been granted on the 2d of March, and could have been therefore valid on the 5th, why might it not have been granted on the 5th; and what difference can there be in a grant made to take effect in a State which you are bound by treaty to admit untrammelled, and in a State already admitted.

It is stated by Kent, (1 Com., 384,) in a note in his commentaries, that it was decided, in the State *v*. New Orleans Navigation Company, 11 Martin, 309, that a territory could grant a charter binding on the State. No such proposition seems to have been made or decided. The positions were, that Congress had no right to establish a Territorial Government, and if so, that such government could not

grant such a charter, and that the charter in that case was void, because repugnant to acts of Congress—all of which the Court decided in the negative. But the position that Congress could not make such a grant, to exist beyond the Territorial Government by its own powers, has never been decided.

Chancellor Kent also refers to Williams *v.* Bank of Michigan, 9 Wendell, 540, 566, as deciding the territories may incorporate a bank, but it decides nothing more—the question for how long is not settled.

The power was given in that case to adopt such laws of the original States as in their judgment were necessary and suitable to the circumstances of the district, and it was decided they might make similar laws.

It is contended upon these grounds, that the grant necessarily terminated *ipso facto* by the admission of Florida. If this doctrine be ·correct, it follows that, on the 3d of March, 1845, the bank expired— that it could live no longer by virtue of its original grant, and it is, therefore, incumbent on the bank to show some new power perpetuating its existence—some authority from the State preserving its ·life, and this must be something more than a mere implication, it must be equal to the positive *grant.* There is no such grant to be found in the constitution or laws of the State, and every inference to be drawn from them .is the other way.

The only clauses which have ever been quoted as continuing this ·corporation, as a grant, is the 14th section of the XIIth article of the constitution, which gives the General Assembly power, at its first session, to regulate, restrain and control all associations claiming to exercise corporate privileges in the State, so as to guard, protect and secure the interests of the people of the State, not violating vested rights, or impairing the obligations of contracts. This is utterly inconsistent with the idea of a previous *grant*, which could not be disturbed in any particular, without consent of the grantees. It is also not a *grant itself*.

The only legitimate construction of this article is, that the Legislature may, at its first session, make such disposition as it may think proper, concerning " associations claiming to exercise, &c.," necessary to protect the interest of the State, not violating rights and property and contracts previously vested in such corporations. But this is no enactment or grant to any particular corporation, or acknowledgement of the existence of any one.

The next clause quoted to sustain this bank, as a grant, is the last clause of section 1 of article XVII., which declares that nothing in this constitution shall impair the obligation of contracts, or violate vested rights, either of individuals, or of associations claiming to exercise corporate privileges in the State." This, doubtless, relates to contracts with corporations and rights vested in them, which it was necessary to save, because the. corporations themselves, the franchises, were to go by the board, by the act of admission. At all events, they are not words of grant—they give away none of the privileges of the people, or the State.

They do not continue alive contracts terminated, rights before divested, and corporations already dead. They only declare that the constitution shall not violate contracts, and which it does not. But neither does it preserve alive grants which expired the moment it came into existence ; but it is held by some, in despair of fixing this charter upon the State, as a contract, that it is *a law*, and that it is in force by virtue of the first part of the 1st section of the XVIIth article of the constitution, which declares " that all laws and parts of laws now in force, or which may be hereafter passed by the Governor and Legislative Council of the Territory of Florida, not repugnant to the provisions of this constitution, shall continue in force until, by operation of their provisions and limitations, the same shall cease to be in force, or until the General Assembly of this State shall alter or repeal the same."

If it is *a law*, it has been always and always would continue to be subject to repeal. As a law, it *is* repealed by the act of Congress which admits Florida upon the same footing as the original States. As a *law*, it is not in force by its own provisions and limitations almost every one of which require the continuance of the Territorial Government.

As a *law*, it is not in force, because repugnant to the Constitution. Almost every clause of the 13th article entitled " Banks and other Corporations," is wholly repugnant to this bank, and seem in effect to have been aimed at it, and intended to provide expressly against the existence of such an institution in the State, and now the same instrument is invoked as a new grant of the same charter. The 6th section alone of Article XIII is wholly repugnant to the Charter of this bank—" Capital shall be created by actual payment of specie therein, and no bank shall borrow money to create or add to its capi-

tal, or to conduct its business, and no loans shall be made on stock." The whole capital here, is borrowed and the very life of the bank is loans upon stock. Again, the whole charter absolutely requires the existence of the *Territory* ; the State cannot substitute itself, if it is a contract, and has not done so if it is a law. But the bank cannot live without the Territory which is incorporated as a part of it—and an essential part, without which it cannot exist. See King *v.* Possmore, 3 Tenn. 241–242–3–245–248. Charter U. Bank, Sec. 16 & 30. Duval's Compilation. When any integral part of a corporation is gone, it is dissolved—a corporation dissolved is dead, and treated in Court as a dead man. Morrison *v.* the Potomac Co., 8 Peters, 208.

Mr. Brockenbrough further argued that under proper constructions of the charter of the bank, and under the facts in this case, the instructions asked by defendants, and refused by the Court, as set forth in defendant's bill of exceptions, should have been given to the jury.

*Thompson* for the Bank :

I. The first position assumed by counsel of plaintiff in error, and which it is claimed arises upon the judgment of the Court below sustaining the demurrer to the seventh plea, is this :—That there is no such corporation as the Union Bank of Florida now existing and capable of suing.

It is admitted that the act of incorporation passed by the Governor and Legislative Council of the Territory, in 1833, was a valid exercise of power, and that it continued legal and valid up to the 3d March, 1845, when it is contended it expired with the power which called it into existence. The Territorial government, it is contended, was a power dependent on Congress and existed but for temporary purposes, and could not make a grant to survive and continue beyond the period of its own existence. That the admission of Florida into the Union operated as a constructive repeal of the charter.

It seems to me that when the power of the Territorial government to make the grant is conceded, the question of the existence of the corporation beyond the period of the existence of the government is conceded with it.

The Territorial government was but temporary, it is true ; still it was to continue until, by the terms of the Treaty with Spain, of 1819,

it was admitted into the Union of the States. Its duration was indefinite, too, yet while it continued it must have possessed the ordinary powers of a government to have made the grant; and if contracts grow up under the government, surely a change in its mere form, or the person of the ruler, will not work an abrogation and destruction of such contracts.

That a grant of the powers of incorporation forms a contract is fully maintained in the Supreme Court of the United States, (Dartmouth College *v.* Woodward, 4 Peters' Cond. Rep., 547–8.) And it is also maintained in that case that the American Revolution did not at all affect the grant of the powers of incorporation to the College made by the British Crown. See pp. 552, 583, 584.

If such be the rule in case of a revolution, in which the former government is put down and abolished by force, surely it cannot be contended that a mere change of government, when the essential form of the State remains unchanged, can have a more injurious effect upon rights acquired under a former government.

The case of Permoli *v.* the First Municipality of New-Orleans, 3 Howard's Sup. Court Rep., 609, decides only that the laws of Congress organizing the Territory of Orleans were repealed by the act of admission of the State of Louisiana. This is not doubted. So, also the laws of Congress organizing the Territorial government of Florida were repealed by the act admitting Florida into the Union, passed 3d March, 1845; yet no contract or rights which became vested under those laws were destroyed by the repeal.

The case of the State *v.* the New-Orleans Navigation Company it seems to me does go further than the counsel for plaintiff in error was willing to admit. The company was chartered by the Territorial Legislature and, after the admission of the State into the Union, it directed a *scire facias* against the company and sought to deprive it of its rights. It is true that the principal ground assumed was that the former government had no power to make the grant, yet if there had been any force in the point now made it could not have escaped the notice of the able counsel and court there. At any rate the Supreme Court of Louisiana maintained that it was a valid and existing grant at the time of decision. See 2 Condensed Louisiana Reports, 203.

But it is contended that there is a difference between the Constitutions of the two States, that of Louisiana providing for the validity

41

of contracts of the State as well as of individuals under the Territorial government. Our Constitution is fully as broad, as we contend, for it provides for "all contracts;" and it is, also, careful in excluding the idea of the violation of any right by the provision of the 1st section of the 17th article : " And nothing in this Constitution shall impair the obligation of contracts or violate vested rights, either of inviduals or associations claiming to exercise corporate privileges in this State." See Thompson's Digest, 8. This, it seems, should be conclusive. The form of government was changed by the Constitution, and that instrument was not to impair contracts or violate rights of individuals or corporations.

Under this head a second objection was taken. *It is contended that,* as no appointment of government directors has been made since 1845, the corporation has ceased to exist.

The 16th section provides, first, for the election of seven directors by the stockholders on the 1st Monday of February ; it also provides for the appointment of five directors on the part of the Territory to be made on the 4th Monday of January annually. It also contains a provision that if such election and appointment shall not be made on the days limited and appointed it may be made at any other time, and those in office shall continue until a new election or appointment, and the board is empowered to fill vacancies by death, resignation or removal from office. These provisions are, it seems, a full answer to the objection. If the State does not make the appointment of government directors, those last in office continue until a new appointment ; if they die, resign, or are removed from office, the Board can fill the vacancy. No omission, therefore, of duty on the part of the State government can work the destruction of the corporation.— The provisions of the charter are ample and cover all contingencies which can arise on this subject. The authorities cited by the counsel for the plaintiffs in error do not apply to such a case.

II. A second point made is as to the right of the bank to sue for the principal sum mentioned in the bond. Although this is a loan under the 29th section of the charter which a stockholder of the bank has a right to require, yet we contend the continuation of the loan is dependent upon the payment of interest at least once a year, and renewal of the obligation by the borrower. But it is argued, that when the sum so borrowed is sued for because of the failure to pay interest, and recovered and paid into the vaults of the bank, the stock-

holder of the bank has a right to put in his note or obligation and take it out again on loan, and therefore it is an act of absurdity to sue for and recover the principal. This bank is one of peculiar features and differs from ordinary banks. It was to borrow its capital upon the Territorial bonds and to pay interest semi-annually upon the amount so borrowed, and two-thirds of its capital was to be lent to the shareholders. The utmost punctuality on the part of this class of its debtors was vitally important to the successful operation of the institution. Therefore we say that payment of interest at least once a year was interposed as a condition, the non-performance of which defeated it. I have no doubt but the bank would have been justified by a court of equity or of law in refusing to renew a loan where the party had failed to pay the interest and forced the bank to the vexation and expense of a law suit. It was a forfeiture which the party must excuse for some good reason, before he should be restored to his original rights. If the bank has to sue each and every stock-holder for the annual interest, the delay and expense would materially cripple the bank in its ability to meet its engagements and preserve the credit of the Territory which had been pledged for its accommodation.

By the amendatory act of 1839 it was provided that the omission to renew the note and pay interest for thirty days should work a forfeiture, and the bank should proceed to sell the stock and receive from the purchaser a bond and mortgage on property of the value of the stock, and such new stockholder should be entitled to all the rights and privileges of an original stockholder. (See Thompson's Digest, 296, sec. 43.) The effect of this was to cut off, as an useless member of the body corporate, one who should fail to perform his obligations, and obtain a new and useful one in his place. This provision would have been effectual, and probably was about the time of its passage, in enforcing the performance by this class of debtors of their obligations ; but unfortunately it was applied too late. The bank had extended itself too far—had lent too much money—had got into difficulties and embarrassments and its notes were becoming depreciated, and the bank could not sell the stock. The prudent who were already in were anxious to get out, and the prudent who were out were determined to keep so. The visionary and speculative and those embarrassed, who were anxious to obtain money at any price might have purchased, but such were not the men who

were calculated to save the institution on the verge of ruin. This was an ancillary remedy, provided by the Legislature to ensure the performance of the obligations of the shareholders; but from the causes I have mentioned, and the depression of values of every species of property which commenced shortly afterwards, has rendered it inoperative. It is, however, useful, as showing the views and intentions of the Legislature, and is, I contend, explanatory of the 29th section and its proviso.

III. The plaintiffs in error place their defence on another ground, viz : that the obligation not being made in strict compliance with the powers given to the corporation by its charter, is, therefore, void, for want of authority on the part of the bank to contract, and the following particulars are assigned :

1. That for the interest on the note a bond was taken in advance, at the time of making the loan.

2. That the obligation was made for a less period than one year,

3. That a greater rate of interest was reserved and taken than was authorized by the charter.

As to the first point, I refer to the 28th section of the charter, which regulates the rate, time and manner of taking interest. It provides for "loans or discounts," and says "the interest may be paid or deducted in advance." Thomp. Dig., 293.

The 29th section does not, in express terms, or by any just implication, change this rule. Its office is merely to provide the loan which the shareholder shall have a right to require, and establishes no new rule as to the time when the interest shall be paid. The term credit is the only new term introduced into this section, and it is, doubtless, used, in conjunction with the term loan, to mean that it s to be granted without security.

But if the 28th section does not apply to the time when the interest may be demanded and paid, then I contend it may be taken in advance, under the general authority " to discount on such *terms* and such securities as they shall judge proper," contained in the 15th section of the charter. Thomp. Dig., 289.

The right to discount, *ex vi termini*, gives the right to take the interest in advance—such is the only mode in which a discount can be made. Bk. U. S. *v.* Fleckner, 5 Pet. Cond. R., 462. Upon this question, I cite, also, the decision of the Court of Appeals of the Territory of Florida, in the case of the Union Bank *v.* Brown, decided at January term, 1844.

2. That the obligation was taken for a less period than one year. I apprehend there is no force in this objection—one year was doubtless the *maximum* of time for which these obligations should be made—they could not be taken for a longer period, but might for any time within that stipulated.    See Union Bank *v*. Brown, before referred to.

3. That a greater rate of interest was reserved and taken than that authorized by the charter, and was, therefore, a void contract, for want of power.    This is supposed to have been effected by two modes : 1. Taking the interest in advance.    2. Computing it by Rowlett's tables.

There is a difference between the exercise of an admittedly existing power in a mode and manner different from the directions of the charter of incorporation, and the assumptions and exercise of powers not given or expressly denied.    See 7 How. Miss. R., 508, Commercial Bank *v*. Nowlan.

When a bank takes a greater rate of interest on a discount than is allowed by its charter, the contract is not void, for want of authority, inasmuch as a discount or loan is within the scope of the powers of a bank ; otherwise, where the power exercised is foreign to the purposes of the creation.    Ibid.    See also Angell & Ames on Corporations, 200, sec. 3.    8 Gill & Johns., 319.    Union Bank *v*. Jacobs, 6 Humph. R., 515.    Mum. *v*. Commission Co., 15 Johns. R., 52.    Hayward *v*. Pilgrim.    21 Pick. R., 270.    Mott *v*. Hicks, 1 Cowen R., 513.    Bank *v*. Hammond, 1 Rich. L. R., 281.

When it is necessary to pursue the particular mode prescribed in making the contract, see Angell & Ames on Corporations, 188.

It could make the loan then, undoubtedly, by the particular directions of the 29th section, or by the general grant of powers contained in the 15th section—*quacunque via data*, it was the admitted exercise of an existing power.

A review of the cases cited by the counsel for the plaintiff in error on this point, will shew that they were :

1. When the corporation transcended the bounds of its powers, either expressly given, or arising by necessary implication.

2. When it acted in violation of some general law restrictive and prohibitory in its character ; or,

3. When the particular mode of contracting was made to constitute the very essence of the contract.

IV. The bond not being void for want of power in the corporation to make the contract, is it void for having exceeded the authority conferred?

And first it is well enough to inquire if it has exceeded the authority given. 1. The right to take interest in advance has already been discussed. Though it was formerly held that taking interest in advance by any other than a banker and on negotiable paper, was illegal—yet this restriction has, by later decisions, been removed. All natural persons, and all corporations who by charter have authority to discount, may do so. 2 Blyd. on Usury, 58, and the authorities cited. Union Bank *v.* Brown, in Court Appeals, January, 1844.

Next, as to the calculation by Rowlett's tables. I refer to the testimony on this point in the Record, p. 37—The interest for the year is calculated at 365 days, and the months as aliquot parts of the year, and give the interest correctly. For the sake of convenience the odd days less than a month are calculated at 30 days for a month. It depends on the mode of using the tables whether they will make any important gain. See Lyon *v.* the Bank, 2 Stew. Ala. R. 469. Bank *v.* Hunter, 1 Dev. R. 129. Bank *v.* Durkee, 1 Vermont R. Crump *v.* Nicholas, 5 Leigh R. 251. Planters Bank *v.* Snodgrass, 4 How. Miss. R. 629.

This point was also expressly decided in the case of the Union Bank *v.* Brown, before referred to in the Court of Appeals of Florida.

The corrupt intention is an essential ingredient in usury—the intent to violate the law and gain more than is allowed.

In addition to the above authorities, I cite, Bank U. S. *v.* Waggener, et. al., 9 Peters R. 378, 400, 401.

The question of the corrupt intention of the bank was expressly left to the jury in the charge No. 5 given, (Record p. 47.) The finding of the jury negatives any such assumption.

2. But supposing it has exceeded the rate of interest fixed by the 28th section of the charter, would the contract for that reason be void?

The charter of the bank contains a restriction merely as to the amount of interest; it contains no penalty, neither does it declare the contract on which more interest than eight per cent. is reserved or taken, to be void.

Banks and other corporations are subject, like natural persons, to the general laws in force at the time of their creation; and if the charter does not provide any penalty for usury, or for excess of pow-

JANUARY TERM, 1849. 721

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Arg'nt of Counsel.

ers, it is to be regulated by such general law. If in making a contract, a corporation should exceed its powers, and the excess can be separated from that part which is within the powers, the excess only is void, and the remainder valid. Such excess of power might be punished by the State as a malfeasance by forfeiture of the charter, yet it would not make the contract void. The following cases, it is believed, will cover the whole ground here assumed :

Fleckner *ads.* Bank U. S., 5 Peters' Cond. R. 464. U. S. Bank *v.* Dandridge, 12 Wheat. 64. U. S. Bank v. Owens, et. al., 9 Peters, 378, 403. Commercial Bank *v.* Nowlan, 7 How. Miss. R. 530. Planters' Bank *v.* Sharp, 4 Smedes and M. 75. Stribling *v.* Bank of Valley, 5 Rand. 140, 151. Louisville R. R. Co., *v.* Litson, 2 How. S. C. R. 127. Thornton *v.* Bank Washington, 3 Peters 42. Philadelphia Loan Co. *v.* Towner, 13 Conn. 249, 260. Bank *v.* Hammond, 1 Rich. L. R. 281. See also Vidal *v.* Girard's Ex'rs., 2 How. S. C. R.

It seems to me, however, that " it does not lie in the mouth" of a stockholder to set up as a defence in a case like this, the excess, or even unlawful assumption of power by the bank, when the result would be a loss of two millions of dollars of the capital of the bank to its creditors, and a gain of that amount by the stockholders, who would be participators in the unlawful act. Little *v.* O'Brien, 9 Mass. 423. Chester Glass Co. *v.* Dewey, 16 Mass. 94.

V. We contend, however, that if the obligation is not good and valid as a loan under the 29th section of the charter, it is good and valid at common law.

The Supreme Court have in several cases laid down with much accuracy, the law on this point. If this agreement is entered into by competent parties, and for a lawful purpose, not prohibited by law, and is founded upon a sufficient consideration, it is a valid contract at common law. See United States *v.* Tingley, 5 Peters, 115. United States *v.* Linn, 15 Peters, 311.

Are the parties to this contract competent to make it ? The deceased, S. Parkhill, in his life time, was certainly able to contract,— and it remains to establish that the bank was equally so.

"In constituting a body corporate, a legal or artificial person is substituted for a natural person, and when a number of natural persons are concerned, there is given to them the property of individuality. The common law of every State or country annexed to this local or

722      SUPREME COURT.

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Arg'nt of Counsel.

artificial person, when created, certain incidents and attributes, and both by the laws of England and the United States there are several powers and capacities, which tacitly and without any express provision, are considered inseparable from every corporation." Angell & Ames on Corp., 95.

Its essence consists in part in the power to take and grant property, contract obligations, and to sue and be sued by its corporate name. Its incidental powers are such as are best calculated to effect the object of its creation. Ibid. 2 Kent's Comm., 224. 4 Wheat. R., 518.

As to mode of contracting, &c., evidence of common consent of corporation sufficient. Angell & Ames, 167–'8, 174. 10 Mass. R., 401. 5 East. R., 239, 292. 6 Viner's Ab., 137, pl. 29.

Whenever a corporation is acting within the scope of the legitimate purposes of its creation, all parol contracts made by its agents are express promises of the corporation. All duties imposed by law, and benefits conferred at their request, raise implied promises, which may be enforced. Bk. of Columbia *v.* Paterson, 7 Cranch R., 299. To lend money and take security for its repayment, was certainly a legitimate act of the Union Bank. See 15th section of Charter.

If a particular mode of contracting is specified, it is only imperative, when the direction *constitutes the terms* on which the power is granted. Angell & Ames on Corp., p. 188. In the charter of the Union Bank, there is no particular form prescribed.

I refer to the decision of the Court in the United States *v.* Linn, 15 Peters, 315, and the remarks of the Court, as to the grounds which would authorize a court to declare an instrument void.

It follows from the positions and authorities, and the evidence in the record, that there were parties able to contract—that they did contract—that there was a sufficient consideration, and that it was for a lawful purpose. It is, therefore, a good contract at common law.

VI. As to the last ground assigned for error, that the judgment was improperly entered up for the plaintiff, the issue of *plene administravit* being found for defendants, the judgment should have been for the defendants generally, notwithstanding the other issues were found for the plaintiff below.

The law, as cited from 2 Lomax on Executors, 446, sec. 11, seems to be supported by 2 Saund. R., 217, (note 1,) which says

JANUARY TERM, 1849. 723

Union Bank *vs.* Parkhill's Adm'rs—cross writs of error.—Opinion of Court.

that if the plaintiff takes issue on the general or special plea of *plene administravit,* and it be found against him, he cannot have judgment of assets *quando acciderint,* and cites 1 Roll. Abr., 929, (B,) pl. 2. Bro. Abr., Executor, 18 S. C.

It is not easy to discover the reason for the difference between the result of a verdict, and the confession of the plea by the plaintiff. In the last case, all the authorities hold that the plaintiff may enter up judgment for assets *quando.* Ibid.

But this seems never to have been the doctrine in the United States. In New York, upon the verdict of no assets, the plaintiff is entitled to his judgment *quando,* &c. 19 Johns. R., 266. 4 Cowen's R., 447. 6 Cowen R., 71.

So in Kentucky, if the plea be found against the plaintiff, he may yet have judgment assets *quando.* Burns *v* Benton, 1 A. K. Mar., 349. It is error, if, upon such a verdict, judgment be entered generally for defendant. Miller *v.* Towles, 4 J. J. Mar., 255.

As to the practice in Pennsylvania, see Wilson *v.* Hurst, Peters' C. C. Rep., 441, n.


LANCASTER, Justice, delivered the opinion of the Court:

This case comes by cross writs of error from Leon Circuit Court. We shall, for the sake of convenience, embody our opinion and rulings in one decision.

The first question, to which we will turn our attention, is one raised in argument by the counsel of the administrators, earnestly argued and much insisted on. By 15th section of the act of incorporation, the bank is created, and declared a body corporate and politic for and during the term of 40 years from the passage of the act, viz : from 13th February, 1833.

By an act of Congress of 3d March, 1845, Florida was declared to be a State of the United States, and admitted into the Union on an equal footing with the original States in all respects whatsoever.

The question raised is, whether the corporation did not perish on the 3d of March 1845, notwithstanding its grant of 40 years existence ; and it is contended the charter must be subject to the implied limitation "provided the Territory shall so long continue."

This question is assumed in argument to arise under plaintiff's demurrer to the seventh and last plea of defendants. That plea in sub-

42

724 SUPREME COURT.

Union Bank *vs.* Parkhill's Adm'rs—cross writs of error.—Opinion of Court.

stance alleges, that the writing obligatory declared on is not the act and deed of defendant's intestate in his life time, but is and was wholly illegal, null and void, because made in consideration of a loan of money upon a pledge of stock, (he being a stockholder), and that the bank, the plaintiff, wilfully and knowingly reserved and took more than the lawful rate of interest allowed to said bank to take upon such loans by law and its charter. Upon argument in the Circuit Court, the demurrer was sustained, and no exception was taken to the ruling of the Court.

The tenor of the plea does not appear to this Court to put in issue the existence of the bank, but virtually admits its existence. This suit was commenced on the 31st of March 1846, and as the position taken is, that the admission of Florida as a State, into the Union, on the 3d of March 1845, by implied limitation, extinguished the charter on that day, no good reason is apparent, why a plea presenting that issue, if deemed necessary to the defence, was not prepared and filed during the preparation for trial of the case. This cause appears to have been elaborately investigated in the Court below, and lengthy bills of exceptions have been filed to the decisions of that Court by each of the parties, and this point is not raised by either bill of exceptions. It does not come by the pleadings before this Court, and any opinion delivered on it, might justly be termed extra-judicial, or *coram non judice.*

To allow points not raised by the record to be adjudicated by this Court, might, and probably would, result most inconveniently. Who could set limits to their number?

The case of Mumma vs. the Potomac Company referred to 8 Peters R. 281, does not appear to sustain the authority of this Court to take jurisdiction of this point. That was a case in which the plaintiff, Mumma, sued out a *sciri facias* to revive a judgment against the Potomac Company. Upon that *sciri facias* the attorneys, by way of plea, shew and suggest to the Court a state of facts, and among other recitals, that the Potomac Company had surrendered its charter to the Chesapeake and Ohio Canal Company, and an agreement to that effect was signed by the counsel for both parties, and made a part of the record. The question upon this agreement was, whether any judgment can be rendered against the Potomac Company upon the *sciri facias* to revive a judgment mentioned in the writ. Upon this question the Circuit Court of the District of Columbia gave judg-

ment for the defendants, which was taken by writ of error to the Supreme Court of the United States, and the judgment of the Circuit Court was affirmed. The jurisdiction of the Court was derived from the writ of *sciri facias* to revive, &c., and not from the agreement of counsel as to the facts; and the decision of the Supreme Court was upon the judgment properly brought before it, from the Circuit Court, and upon the point on which that judgment was rendered. In the case before this Court, although the counsel for the bank did not decline the argument of the point now under consideration, yet there is no agreement of counsel on the record submitting it for adjudication; and if there was, the case before referred to, would not be an authority to justify this Court, in proceeding to its adjudication. Without therefore, any disposition to avoid it, if properly before us, we must in this case decline its decision.

The questions on the record in this case, arising from the decisions of the Circuit Court, admitting on the trial testimony excepted to, refusing instructions asked, and giving instructions excepted to, as well as a refusal to admit testimony offered, and exceptions thereto taken, seems to this Court to render a review of many provisions of the act of incorporation, as well as amendments thereto, necessary, in order to give a construction to the charter, applicable to the many questions presented on the trial below. We proceed to that review, first remarking that but little light is afforded us by the decisions either in England or the United States, upon the subjects involved. But few charters of incorporation, bearing much analogy to that of the Union Bank of Florida, have been passed by the States of the Union, and it is not known that any similar ones have been passed elsewhere. Neither is it known or believed, that any of those incorporated in any of the States, have undergone judicial investigation or construction, so as in any degree to aid this Court in arriving at sound and just conclusions. There are, however, rules laid down in the books, by which to be guided in the construction of statutes, and to these we shall have recourse as occasion may seem to require.

The 1st section of the act of incorporation provides for the establishment of the " Union Bank of Florida with a capital of one million of dollars, and with the privilege of increasing it to three millions of dollars, which capital shall be raised by means of a loan, on the faith of the Territory, by the Directors of the Bank." Of which only one million to be taken at the time of organizing the bank.

By the 2d section, books of subscription, towards constituting the capital fund of said bank, were authorized to be opened at Tallahassee and other places therein named, for subscription to the stock.

By the 7th section, " The Board of Directors of the bank shall be the judges of the sufficiency of the mortgages offered for the stock, and shall have power to reject the same."

The 8th section enacts, " To secure the principal and interest of the bonds to be issued by the Territory, for the purpose of raising the capital of the bank, the subscribers shall be bound to give a bond and mortgage to the satisfaction of the Board of Directors, on property, &c."

The 9th section provides, " The bonds and mortgages given to secure the subscriptions to the capital stock of said bank, shall be deposited in the office of said institution, the said mortgages having been first recorded according to law ; and whenever application shall be made by a stockholder to transfer his stock and be discharged, such transfer and discharge may take place, upon the new stockholder complying with the same requisitions stipulated in the foregoing (the 8th) section, in the case of an original subscriber, and in all such cases of transfer and discharge, the votes shall be taken by yeas and nays. But any stockholder may, at any time, release his property by paying the amount subscribed, and also such loans as may have been made on the faith of it.

The 10th section provides for issuing one thousand bonds of one thousand dollars each, made payable to the Union Bank of Florida, to be " signed by the Governor, and countersigned by the Treasurer, and under the seal of the Territory," for which bonds a form is given in said section ; which bonds are made transferrable by the endorsement of the president and of the cashier of said bank by said section—for the payment of which, the faith of the Territory is pledged, "in order to facilitate the negotiation by said bank for the loan of one million of dollars."

The 11th section provides, that "Both the capital and interest of the said bonds shall be paid by said bank, as the same shall become due."

The 14th section prescribes the form of the mortgage to be given to the Union Bank by the stockholders, and begins by saying, " The mortgage to be given by the subscribers to the stock of the Union Bank, shall be in the following form :"

We will inquire, what constitutes a stockholder in the Union

JANUARY TERM, 1849. 727

Union Bank *vs.* Parkhill's Admr's—cross writs of error.—Opinion of Court.

Bank, and what are the rights of the bank in the stock subscribed to it?

It may safely be assumed the act of subscribing for shares, as provided in sec. 2 of the charter, does not *per se* make a stockholder, any more than the mere subscribing for cash stock will make a stockholder in an ordinary banking incorporation. In the latter case, the shares subscribed must be paid for in money; in the former, according to the sections before recited, they were paid for by the bond and mortgage of the stockholder. The giving a mortgage for the stock satisfactory to the Board of Directors, was the final act necessary to constitute a subscriber for shares a stockholder. See sec. 7; and that mortgages made and delivered to the Union Bank was the only consideration or payment of any nature given by the stockholder to the bank, for his shares or certificate of stock in it.

The bank, then, being, under the charter, the lawful possessor and owner of the mortgages, makes them available by the 8th and 10th sections, for the procurement of territorial bonds. These bonds were, by the 10th section of the charter, made payable to the bank, and transferrable by the endorsement of the president and cashier of the bank; and by the 11th section, after sold, both capital and interest payable or redeemable by the bank, as it becomes due. It appears, therefore, too plain to be questionable, the bonds, when procured, were the property of the bank, and when sold, the funds arising from the sale were the funds of the bank.

It is contended, in view of the 8th section, the object for which a bond and mortgage was given by the subscriber for stock, was to secure payment of the principal and interest of the bonds issued by the Territory, to the extent of his stock subscription. It is admitted they were given for that purpose, yet it seems to this Court that was not the only purpose of the mortgage. The last clause of section 9th provides, "but any stockholder may, at any time, release his property ( *mortgaged*) by paying the amount subscribed, (as stock,) and also (by paying) such loans as may have been made on the faith of it," (*the mortgaged property.*)

*It* (the last word of the sentence) must, on sound rules of grammatical construction, refer to its last antecedent noun, which is *property*; so that, supposing the stock to have been paid for in money, the stockholder, to have his property released from the mortgage lien of the bank, must also pay such loans as may have been made on the faith of the property specified in the mortgage.

Shares in this bank were not, as in banks usually, purchased by cash payments ; and while a stockholder in a cash stock bank would, on a pledge of shares, pledge the very money he had paid for them, in this bank, unless he pledged the mortgage securities given for stock, he would pledge nothing valuable ; so that, if contended loans were to be made on the faith of the subscription for stock, without reference to the mortgage security, then the gross absurdity will follow, that the bank was bound to loan to its stockholders, without any security whatever.

Suppose for a moment, the instant of time when, according to its charter, the Union Bank was first in a condition to discount—it was the holder and owner of mortgages on real estate and negroes, executed and delivered to it by its stockholders, to the value of one million of dollars. It was also the holder and owner of one million of dollars in money, produced by the sale of the bonds, and for the payment and redemption of the principal and interest of these bonds, as they might fall due, it was bound ; and if the time we are considering occurred before any interest had accrued on the bonds after sale, yet the bank owed just as much money as it possessed, and the stockholders had no valuable interest in bank save their mortgages. The stock, for which nothing had been paid, if we exclude the idea of the mortgages, had not really appreciated, and was really worth nothing, save only such ideal appreciation as the right to a loan under the 29th section of the charter might induce those needing money to be willing to pay for that right of loan. If, at that time, a stockholder had a right to credit in bank, without other security than a pledge of his shares in the capital stock of the bank, and also a loan on a pledge of those shares for two-thirds their amount, still, excluding the idea that the mortgage had been given as payment for the shares, we must arrive at the conclusion that he, the stockholder, had a right to demand and have from the bank a stock loan, without any valuable security whatever ; and thus, that the bank was compelled by its charter to loan to its stockholders two-thirds of its entire money capital, with a positive certainty that neither principal nor interest on that loan would ever be paid before the expiration of its charter, and almost with an equal certainty, not at that time or any other. Such we feel authorized from the wording of the charter, to declare was not the intention of the Legislature, and cannot be a sound construction of its provisions. We have shown, we think, that the mort-

gage given by the stockholder to the bank, was executed for the double purpose—1. As provided by the 8th section, to secure payment by the bank of the principal and interest of the bonds issued by the Territory ; and for this purpose, the Territory, the third party, in the charter of the bank is interested in the mortgages; 2d. To secure payment from the stockholder to the bank of his stock note, or obligation, and interest, provided he fails to renew the note or obligation, and pay interest, as provided in the 29th section—and for this purpose, the bank and all its creditors are interested in the mortgages, as well as for the first purpose.

It has been alleged in argument, and indeed the Court below virtually so instructed the jury, that the money raised by the sale of the bonds was, in the hands of the bank, the money of the stockholders—that the bonds sold by the bank were, *in form only*, the bonds of the Territorial government, and in *effect* and *actually were* the bonds of the stockholders, and are in effect and contemplation of law, as if both bond and mortgage had been originally made and executed to the capitalist or holder of the territorial bonds by the stockholder—that, upon the sale of the bonds, the stockholder became debtor to the vendee of the bonds, and he, in turn, the creditor of the stockholder—that the bank was a mere agent or trustee of the stockholder, to see the principal and interest paid, agreeably to the terms of the bond and mortgage, without other rights in the premises, save the privilege of endorsing for its principal, the stockholder.

The 1st section of the charter incorporates a bank by the name of the " Union Bank of Florida," and says it shall have a capital of one million of dollars, with the privilege of increasing to three millions.

The 15th section provides that " The subscribers to the stock of said Union Bank, their successors and assigns, shall be and they are by this present act created a *corporation* and *body politic,* for and during the term of forty years from the passage of this act, and shall be and are hereby made capable, under the name of the ' Union Bank of Florida,' to receive and possess all kinds of property, either movable or immovable, and to sell, grant, alienate, demise and to dispose of the same—to loan, negotiate, take mortgages and pledges, and to discount on such terms and such securities as they shall judge proper ;" and after some provisos not necessary here to be considered, the section adds : " They may sue and be sued, plead and be

pleaded, answer and receive answers in all courts having competent jurisdiction, and to have a common seal, and the same to alter and renew at pleasure, and to ordain and establish such by-laws, rules and ordinances as they shall deem necessary and suitable for the government of the said corporation, not being contrary to this act, nor to the constitution and laws of the United States, or to the laws of the Territory of Florida."

The Union Bank of Florida, by these provisions of its charter, may justly be styled *a corporation,* and is a creature of the charter that constitutes and gives it being, and prescribes bounds and limits to its operations beyond which it cannot regularly proceed. See Bac. Abr. title corporation, letter D., and many authorities there cited. Its name is the very knot of the combination of its members, without which they could not perform their corporate acts, for it is nobody to plead and be impleaded, to take and give, until it hath gotten a name. Bac. Abr. Corporations, Letter C. Although a corporation aggregate is said to be invisible, and to exist only in supposition and intendment of law, yet such an artificial body is, by its creation, capable of purchasing or parting with its possessions. Bac. Abr. on Corporations, Letter E. The name of a corporation is as the name of baptism. 10 Co. 28. 2d Inst. 666.

We repeat, therefore, what we have before shewn, the mortgages belonged to the bank, for it had a right to take mortgages. The Territorial bonds, issued and made payable to the bank, were also the property of the bank, for they were issued on the faith and value of the mortgages held by and belonging to the bank ; and the proceeds of the sales of those bonds belonged to the bank, for it, and it alone, by its officers, had the right to sell and transfer them.

It is said, on the sale of the Territorial bonds, the stockholder became debtor to the vendee of the bonds, and he in turn became creditor to the stockholder. Without remarking on the novelty and surprise with which this doctrine would strike the bondholder—let us see if it be so. Is every bond so marked that each bondholder can know what stockholder he must look to for its payment ? Or must he look to all the stockholders, and has he any means of knowing them, or any of them, but through the courtesy of the bank ? If a stockholder is the debtor of a bondholder, is it of all bondholders, or a particular one ? And if a particular one, is it for all the bonds he may hold, or only for so many bonds, and parts of bonds as his stock

may amount to? Should he transfer his stock, as by the charter he may, does he make his transferee the real debtor, and release himself without the knowledge or consent of *his* creditor, the bondholder? Answers to these inquiries will, in the opinion of this Court, fully shew the fallacy of the position assigned the stockholder, and which they are intended to controvert.

The first clause of the 3d section of the act of incorporation is also invoked to shew the charter will not admit of the construction in this opinion indicated. That clause is in these words. " In all instances in which slaves shall be mortgaged, in virtue of this act, the possession thereof shall be and remain in the mortgagor, any law to the contrary notwithstanding, until by the covenant or covenants contained in said mortgage, it shall be lawful for the said bank to seize the same." Let us premise, if it was intended at all events to permit the stockholder to remain in possession of the slaves mortgaged, any law to the contrary notwithstanding, until the expiration of the charter of the bank, why did the Legislature not say so, instead of using the more doubtful and circumlocutory language adopted? If we adopt the construction that the language used (and such it is contended is its meaning) was intended to protect the mortgagor in possession of the slaves until the Territorial bonds shall become due, and the bank shall make default in their payment, we must destroy the plain intent of the 9th and 22d sections of the charter. If we understand the covenant or covenants contained in the mortgage to apply as well to the payment of the stock note, or obligation of the stockholder, as to securing payment of the Territorial bonds when due, and that on default of complying with the proviso in the 29th section, to give a note or obligation annually for repayment of the money, (loaned) and paying up the interest, the bank may seize the mortgaged negroes, then we save the 9th, 22d, 26th, and other sections of this charter, and make all stand together, and all bear in the rights and duties both of the bank and its stockholders, and all tend to advance the interest of the creditors of the bank; while the contrary construction would tend to make of the stockholders an irresponsible class with exclusive privileges, (and the greater the stockholder, the greater the privilege,) as well also as inflict on the bondholders and other creditors of the bank, the greatest injury and the most stupendous fraud. Can there be a doubt we should adopt a construction which makes the mortgage property responsible for the stock note due the bank.

43

In the case of the Commonwealth vs. Kimball, 24 Pick. 370, Ch. Justice Shaw says : " It is unquestionably a well settled rule of construction, applicable as well to penal statutes as to others, that when the words are not precise and clear, such construction will be adopted as shall appear most reasonable, and best suited to accomplish the objects of the statute ; and where any particular construction would lead to absurd consequences, it will be presumed that some exception or qualification was intended by the Legislature to avoid such conclusion." In the case of Wales *v.* Stetson, 2 Mass. 146, Ch. Justice Parsons says : " In the consideration of the provisions of any statute they ought to receive such a reasonable construction, if the words and subject matter will admit of it, as that the existing rights of the public, or of individuals, be not infringed.".

In Bac. Abr. title statute, letter H. it is laid down, " The most natural and genuine way of construing a statute, is to construe one part by another part of the same statute, and this best expresseth the meaning of the makers, and such construction is *ex viceribus actus.*" And again, same title. " If the literal expressions of the law would lead to absurd, unjust, or inconvenient consequences, such a construction should be given as to avoid such consequences, if from the whole purview of the law, and giving effect to the words used, it may be fairly done."

Impressed with the soundness and wisdom of the afore recited rules, and aiming to adjudicate by their spirit and true meaning, construing one part by another part of the whole charter of the bank, and in view of the verbal obscurity in some of the provisions, which render it difficult to arrive at the true meaning of the Legislature, but bound to presume it was never the intention of the Legislature, that absurd, or unjust, or even inconvenient consequences should flow from the enactments contained in the charter, we think in every instance where a stockholder fails to renew his note, and pay up the interest, if the bank shall file for cancellation, with any officer of the Government, whose duty it may be to receive them for that purpose, and in default of such an one, with the Clerk of the Court in which suit may be depending, to be delivered to such officer for the same purpose, as many Territorial bonds as were issued on the faith and value of the mortgage securities of such defaulting stockholder—that then the bank, upon judgment rendered and execution issued, may of right and according to the law of its charter, levy upon and sell all the mortgaged premises of such defaulting stockholder to be applied to the

extinguishment of the judgment rendered on his stock note debt, together with interest due and costs accrued, the residue, if any, to be first applied to liquidate his liabilities in bank, as endorser or security, and the remainder, if any, to be paid to him.

Two exceptions taken by the plaintiff below to the decisions of the Circuit Court, admitting testimony upon the plea of *plene administravit*, remain to be considered. 1st. Certain receipts of H. Manly, the present husband of the relict of S. Parkhill, deceased, the intestate of defendants, which receipts purport to have been given for sums in part of the dower of Mrs. Manly, rejected by the Court of Probate. 2d. The admission of testimony upon an alleged liability of the administrators for counsel fees, and for which they claim the right of retainer of such sum as the witness supposes would be a reasonable aggregate compensation for services of counsel in this case, and some twenty cases of detinue brought by Parkhill's administrators, and also a suit for foreclosure brought by the bank against Mrs. Manly and her husband, which was carried to the Supreme Court.

The act of the Legislature of February 15, 1834, concerning the duties of Executors, Administrators and Guardians, (see Tho. Dig. p. 207), provides for the settlement annually of the accounts of Executors and Administrators by the Judge of Probates, and that they shall render full and correct accounts of the receipts and disbursements of the estates in their charge, and says, " if approved, or so much thereof as may be approved, it shall be entered on the record ;" and the accounts filed. If it be not approved, the only proper course by which the Executor or Administrator can attain redress, if injured, is by appeal or writ of error. But if rejected, as the order of the Court of Probates is conclusive until reversed, it is not seen how the administrators can be permitted to avail themselves of it as evidence on the plea of *plene administravit*. And this objection lies as well to the evidence to establish the value of the counsel fees, which, as well as the first, should have been audited and allowed, or if rejected, by appeal reversed, before a right to use them as evidence on the plea of *plene administravit* could attach. On the subject of counsel fees we will remark, it is laid down in the case of Sterrett's appeal, 2 Penn. Reps. 426, " Where an estate is so situated that legal advice is proper to direct the course of the Executors, or where they must bring suits to recover part of the estate, or defend suits brought against them, counsel must be employed, and where they are em-

ployed to obtain what is honestly supposed to be the rights of the estate, the estate ought to pay the counsel fees.   But where Executors neglect to settle and pay, and are sued by creditors or cited by heirs, and employ counsel to defend them in their iniquity, no counsel fees should come from the estate."   And this doctrine, in our opinion, is correct.

On the trial of this cause, the Circuit Court gave ten instructions, numbered from one to six inclusive, and from eleven to fourteen inclusive—to all which, defendants by their counsel excepted, save the second, and also moved the Court to give fifteen several instructions, which the Court refused, except the third, which was granted, and the fourth, which was refused, and substituted by another—all which is contained in their bill of exceptions, and by reference to the record will fully and at large appear.   To all which refusals, the defendants by counsel excepted, and prayed their bill of exceptions may be signed, sealed and made part of the record, which was done ; and thereupon they obtained and sued out their cross writ of error to this Court.

By reference to the instructions given and refused, and excepted to by the defendants below, it will be perceived the principal points they make are aimed at the rate of interest which the bank might lawfully demand and take from a stockholder who was its borrower, and the time at which that interest was payable to the bank.

To have a clear understanding of these questions, it is necessary to examine the 28th and 29th sections of the charter, which are as follows : " Sec. 28.  Upon loans or discounts, the said bank shall not receive more than at the rate of eight per centum per annum—the interest may be paid or deducted in advance."   " Sec. 29.  Each and every stockholder shall be entitled to a credit or loan equal to two-thirds of the total amount of his shares : *Provided*, That notes or obligations for repayment of the money shall be annually received, and the interest paid up : *And provided, also*, that when the accumulated surplus profits shall have equalled the amount of the bonds issued by the Territory for obtaining the capital of the bank, the interest upon all loans shall be reduced to a rate not exceeding six per centum per annum."

We think it manifest, from the last proviso of the 29th section, the rate of interest which the bank was authorized by law to charge, was more than six per centum per annum ; otherwise, why did the

legislature provide, upon the contingency therein named, that the rate of interest should be reduced, so as not to exceed that sum.

The true construction of the word *credit* in the 29th section, has been the source of much discussion, and it has been contended it is of such extensive import or signification as to entitle a stockholder, at all times and under all circumstances, to a loan from the bank, equal to two-thirds of the amount of his shares.    The term is used in the connection, " *credit* or *loan*," and was probably intended by the legislature for nothing more than an equivalent for the word " *loan*," or it may have been intended to invest the stockholder, on the faith and virtue of the mortgage securities he had given the bank, with a right to a loan, free of the endorsers which an ordinary borrower might be required to give.    But whichsoever may be the true intent and meaning with which it was used, it was subject to the proviso, that notes or obligations for repayment of the money (borrowed) shall be annually received and the interest paid up.    It was contended that this proviso did not create a condition precedent or subsequent to defeat the loan ; and if a condition, could only be a condition subsequent to defeat the continuance of the loan.

Will or can any one successfully contend that a stockholder, as such, was or could be entitled to any loans whatever, unless he first gave a note or obligation for repayment of the money borrowed, and if that was necessary, (as we think it was,) whether it was not a condition precedent to obtaining a loan ?    At the time of giving a note or obligation for repayment of the money, by the conjunction *and* he was also required to pay up the interest.    So it seems the giving the note and paying the interest at the time of borrowing the money, are both conditions precedent, properly deducible from the 29th section of the charter.

It is objected the frame of words, " *and the interest paid up*," are repugnant to this construction, and they must mean interest *in arrear*, but with equal propriety they may mean interest *in advance ;* and this construction of the 29th section harmonizes with the only rational one of which the 28th is susceptible.    It provides that the interest may be paid up or deducted *in advance* upon *loans* or discounts by the bank.    The terms, " may be paid or deducted in advance," are terms directory and enabling to the bank, as are all the provisions of that section ; and if we understand that the bank, upon a loan or discount, may deduct the interest in advance, or upon a re-

newal, may require it to be paid in advance, we but understand these words according to their natural force and usual import. The proviso, therefore, in our opinion, contains two conditions precedent to a stockholder's obtaining or continuing a loan under the 29th section ; for a failure to perform either, (to wit : renew the note, or pay the interest,) would determine the duration of the loan, divest the right to have it, and invest the bank with a right of action against such defaulting stockholder. The authority of the bank, under the 28th section, to deduct interest in advance, is an authority co-extensive with the loans or discounts it may make ; and this *is a loan*, peculiar in nothing save the right of the stockholder to have it, so long as he complies with the precedent conditions prescribed for his observance.

The bank has, according to the 28th section, as much right to deduct interest in advance on such a loan as on any other. That section further provides, the bank shall not receive more than at the rate of eight per centum per annum, but it may be deducted or paid in advance. The rate, therefore, of interest, which, by its charter, the bank may deduct upon a loan or discount, is eight dollars from one hundred for the use of the residue for one year, and at the same rate for any shorter time—the *obligation* of a borrowing stockholder being to renew his note and pay the interest once a year ; but according to bank usage, his *privilege* to renew and pay interest oftener, as might suit his convenience. And if there be error in this, as it benefits the stockholder, he cannot complain.

The construction of the 28th and 29th sections, above given, appears to the Court to be strengthened by other provisions of the charter. The last proviso in the 29th section contemplates, during the existence of the charter, surplus profits equal in amount to the Territorial bonds issued.

The 23d section contemplates surplus profits, provides for their management, appropriates subsequent profits, assigning a share to the Territory, as well also as the mode, on the expiration of the charter, of a division of capital.

The 36th section directs the disposition which shall be made of the profits which shall accrue to the Territory, and in other sections of the charter, mention is made of the surplus profits.

Now, when it is recollected that two, out of its three millions of capital, must, if required, be loaned to its stockholders—that near

that amount was in fact loaned them—that the bank itself has a continually accruing interest debt, payable to its creditors, which amounts annually to $180,000, besides contingent expenses as they may occur—unless a rigid exaction of interest is demanded of the stockholders, it would seem to require unusual arithmetical powers to enable a financier to discover how those surplus profits could arise.

The bank is known to be in an embarrassed condition, from which it will hardly recover, and has no surplus profits to manage. The value of its stock has depreciated, and is far below par. Yet it is perhaps not too much to say, had the debtors (stockholders and others) *bona fide* and fully paid interest on their respective liabilities, as the same were due the bank, unless, indeed, it was otherwise very badly managed, or had met with great and unavoidable misfortunes, it would now have in possession large surplus profits—its stock would be much above par, and its creditors would hold its liabilities at their original cash value.

We think, then, the bank had and has a right to interest on stock loans, at the rate of eight per centum per annum, and also to deduct it, or require its payment in advance. The giving a note and payment of interest are conditions precedent, and without the performance of both, the stockholder has no right to a loan ; or at any renewal or failure to perform both, determines the stockholder's right to his loan, and unless he pays the whole amount borrowed, the bank has a right of action against him.

Some objections have been raised in this case upon the use of Rowlett's interest tables. We will remark, that, from the testimony, it seems abundantly clear, the officers of the bank, when computing for a year by those tables, computed for a solar year, or three hundred and sixty five days, and for a month or months as aliquot parts of a year ; in all which there cannot be error. But when computing for less than a month, as for days of grace, they computed each day as the 1-30th of a month, instead of the 1-365th part of a year. In computing fractions of a month, it is not easy, as every practical arithmetician must know, to adopt any rule but the one adopted in the tables, to wit : of supposing the month to consist of thirty days, which is nearer the 12th part of the year than any other integral number. We think the rule for practical purposes, the most accurate which has yet been devised, and are not inclined to condemn it.

The subject of the sale of the stock of Samuel Parkhill, under the amended charter passed in the year 1839, was also raised by the instructions asked by the defendants in the Court below. By the 2d section of that amendatory act, the sale could only be perfected by the purchaser executing to the bank, within ten days thereafter, bonds and mortgages necessary to make him a stockholder to the amount of the stock purchased. If that was not done (as from the testimony in this case, it seems, was not), the sale would not be valid, and would not divest the liability or interest of the original stockholder.

The amendments contained in this law were only cumulative remedies, by way of penalty to coerce stockholders to a more exact observance of renewing their notes, and paying up the interest, and we think a failure to effect and carry out its provisions, does not divest the bank of any other remedies given by the provisions of its charter, and the law of the land against a defaulting stockholder.

Upon the subjects of the rate of bank interest, the time when it is payable, the use of Rowlett's tables, and the time for which a stockholder's note is required by the charter to be given, we are fully sustained in the positions we assume, by a very able decision delivered by Judge Bronson, at the January term, 1844, of the late Court of Appeals of the Territory of Florida, and we take pleasure in saying, that decision discusses the whole of the subjects with a perspicuity and clearness, alike honorable to the heads as the hearts of the very able Court from which it emanated.

Having, as we think, fully reviewed all the points raised by the bill of exceptions in this case, which are deemed necessary to its proper determination, and having, we trust, given a reasonable, a just and correct construction to such provisions of the charter as seemed proper or necessary to examine, it now remains to pronounce the rulings of this Court, based upon the record presented, and the exposition of the charter, and the legal rights of the parties, as hereinbefore set forth, explained and declared.

We are of opinion that the Circuit Court erred in permitting the receipts offered as evidence by the defendant, Moseley, as part of the dower of Mrs. Manly, to go in evidence before the jury, on the plea of *plene administravit*, and also the evidence concerning the counsel fees—which decisions are hereby overruled and reversed. We are of opinion the Circuit Court erred in refusing to instruct the jury, as prayed by the plaintiff below in its bill of exceptions, and also in

each of the six instructions given by the Court, and to which the plaintiff by its counsel excepted ; which said decisions of the Court, refusing to instruct as prayed, and instructions given and excepted to, are hereby overruled and reversed.

We are further of opinion, that on the nine instructions given by the Court, and excepted to by defendants by their counsel, there is nothing to which defendants can take any legal exception, as the said instructions were fully as favorable to them as by law they had a right to require. And as to the instructions asked by defendants and refused by the Court, and to which they by counsel excepted, upon a careful examination, we do not think they were by law entitled to the allowance of any of them, and therein have perceived no error.

It is, therefore, ordered, adjudged and decreed, upon the writ of error sued out by the "Union Bank of Florida" in this case, that the judgment of the Court below be reversed, annulled and set aside— that a *venire facias de novo* be awarded, and a trial be thereon had, according to the principles contained in this opinion—that the cross writ of error sued out by the defendants below in this cause be dismissed, and that they take nothing thereby, and that the plaintiff in error, the Union Bank of Florida, recover its costs, &c.